# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| DOMENIC BUFALINI and<br>LORI LEE BUFALINI,<br><br>    Plaintiffs,<br><br>v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.<br>f/k/a VOLKSWAGEN OF AMERICA, INC.<br>VOLKSWAGEN AKTIENGESELLSCHAFF,<br>and AUDI AKTIENGESELLSCHAFF,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)   Case No.: _____<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Domenic Bufalini and Lori Lee Bufalini, by counsel, file this Complaint against Volkswagen Group of America, Inc., f/k/a Volkswagen of America, Inc., Volkswagen Aktiengesellschaft, and Audi Aktiengesellschaft, and allege as follows:

## PARTIES

## Plaintiff

1.    Domenic Bufalini and Lori Lee Bufalini (hereinafter "Plaintiff" or "Plaintiffs" whether one or more) are residents of the Commonwealth of Pennsylvania, who acquired a 2014 Volkswagen Touareg TDI diesel (the "Vehicle") on November 1, 2014 from Defendants' authorized dealership in the State of Maryland, timely opted out of the VW Class Action Settlement with respect to this Vehicle if required, and are not precluded or prohibited in any manner from bringing this individual lawsuit seeking individual damages.

## Defendants

2.      Defendant Volkswagen Group of America, Inc., f/k/a Volkswagen of America, Inc. ("VWGOA" or "VW America" or "Volkswagen America") is a corporation organized under the laws of the State of New Jersey, with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171, located within Fairfax County, Virginia. Defendant also conducts certain operations under the name Audi of America, Inc. ("Audi America"), which it has registered as a fictitious name with the Virginia State Corporation Commission.   VWGOA is a wholly-owned subsidiary of Volkswagen Aktiengesellschaft.  VWGOA imported, marketed and sold the Vehicle that is the subject of this lawsuit.

3.      Volkswagen Aktiengesellschaft ("VWAG" or "Volkswagen AG") is a German corporation with its principal place of business at Berliner Ring 2, 38440 Wolfsburg, Germany. VWAG is the parent company of VWGOA.  Volkswagen AG designs, develops, manufacturers, and sells automobiles. VWAG was responsible for some of the manufacturing of the Vehicle that is subject of this lawsuit.

4.      Audi Aktiengesellschaft ("Audi AG") is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is a wholly-owned subsidiary of VWAG. Audi AG designs, develops, manufacturers, and sells automobiles. Audi AG designed the engine of the Vehicle that is the subject of this lawsuit, and Audi AG was responsible for some of the manufacturing of the Vehicle that is subject of this lawsuit.

5.      Volkswagen Group of America, Inc., Volkswagen Aktiengesellschaft and Audi Aktiengesellschaft operate a joint venture (the "Joint Venture") whereby those parties

agreed to assist each other in designing, manufacturing, importing, distributing, marketing and selling certain motor vehicles in the United States, including the so-called Audi TDI "Clean Diesel" vehicle at-issue in this case. At the critical stages in the foregoing activities, VWGOA, VWAG and Audi AG acted as the agent for the other in pursuing their common goal of selling automobiles in the United States. VWGOA, VWAG and Audi AG each maintained a voice in the control and management of this enterprise, and each shared in the profits and losses of the enterprise. The Joint Venture arose in Virginia and is centered in Virginia, and therefore, Virginia law controls the rights and liabilities of the Joint Venture vis-à-vis third parties. Under Virginia law, the Joint Venture is treated as a partnership, and under applicable Virginia partnership law, each partner is jointly and severally liable for the tortious acts of the partnership committed in furtherance of the enterprise. Va. Code § 50-73.96. Given the foregoing, VWGOA, VWAG, and Audi AG are jointly and severally liable for tortious acts of each other. The term "Volkswagen" "VW" or "Defendants" as used herein refers to both the Joint Venture and collectively to VWGOA, VWAG and Audi AG.

## AGENCY

6.     At all relevant times to the allegations in this lawsuit, VW America, Audi AG, and Audi America were the agents of VWAG and all misrepresentations at issue in this lawsuit and described below in more detail were made with knowledge and intent by VWAG, VW America, Audi AG, and Audi America that the misrepresentations would be repeated to third-parties, like Plaintiffs, and that such third-parties would rely on them.

## PERSONAL JURISDICTION

### Volkswagen America

7.     Personal jurisdiction over VWGOA in Michigan is proper because it is registered to do business in Michigan and maintains significant and ongoing operations located within Michigan, including its offices charged with the task of overseeing emissions' compliance and obtaining the requisite approvals to be able to sell Volkswagen vehicles here in the United States.

### Volkswagen AG

8.     Personal jurisdiction over VWAG in Michigan is proper because: (a) VWAG transacts business in Michigan by virtue of its relationship with VWGOA and by virtue of its importing automobiles offered for sale in Michigan to consumers; (b) VWAG contracts with VWGOA to supply goods and services in Michigan; (c) VWAG uses VWGOA's offices in Michigan to further its business interests; (d) VWGOA's actions in and contacts with Michigan can be imputed to VWAG because of the agency relationship between those parties; (e) VWGOA's actions in and jurisdictional contacts with Michigan are imputed to VWAG by virtue of the Joint Venture; (f) VWAG pled guilty to criminal conduct in Michigan relating to the manufacture and sale of the Fraudulent Vehicles.

9.     Personal jurisdiction over VWAG is also proper because VWAG both directly and indirectly caused tortious injury by an act or omission in Michigan and regularly does or solicits business, engages in a persistent course of conduct, and derives substantial revenue from goods used or consumed or services rendered in Michigan.

10.     Personal jurisdiction over VWAG in Michigan is further proper because of VWAG's own direct contacts with the state of Michigan concerning the fraud that forms the basis of this

lawsuit. Personal jurisdiction over VWAG is further proper because the Michigan contacts of VWGOA concerning the fraud that forms the basis of this lawsuit can be imputed to VWAG pursuant to the agency relationship between and among the parties, alter ego, conspiracy theory, and joint venture.

11.     VWGOA is the agent, both actual and implied, of VWAG and was VWAG's agent as to the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in the United States and in Michigan. VWGOA carried out the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in Michigan as VWAG's agent.  VWGOA's actions in, and contacts with, Michigan can be imputed to VWAG because of the agency relationship between and among those parties.

12.     VWGOA is the alter ego of VWAG because there is (1) a unity of interest and ownership; and (2) VWAG used VWGOA to evade a personal obligation in Michigan, to perpetrate fraud or a crime in Michigan, and to commit an injustice in Michigan, and to gain an unfair advantage in Michigan. VWAG used VWGOA in Michigan as its alter ego for the marketing, promotion, sale and distribution of the Fraudulent Vehicles in the United States and in Michigan. VWGOA, a wholly owned subsidiary of VWAG, with its central emissions' and regulatory compliance office located in Michigan, exists solely to promote the sale and distribution of VWAG and Audi AG products, including the Fraudulent Vehicles, in the United States and in Michigan.  VWGOA's actions in, and contacts with, Michigan can be imputed to VWAG pursuant to an alter ego theory.

13.     Because VWGOA and VWAG were engaged in a joint venture under Virginia law, VWGOA's jurisdictional contacts with Michigan are imputed to VWAG by virtue of the Joint Venture.

14.     Personal jurisdiction is also proper over VWAG because of VWAG's own contacts with Michigan regarding the fraud that forms the basis of this lawsuit.  VWAG sold to VWGOA the Fraudulent Vehicle purchased by the Plaintiffs herein, along with hundreds of thousands of other fraudulent Volkswagen and Audi-branded automobiles, with the knowledge and intent that VWGOA would resell and distribute those vehicles to consumers throughout the United States, including in Michigan.  VWAG knew that the approvals for such Fraudulent Vehicles would all be funneled through VWGOA's offices in Michigan.  VWAG also worked with and directed VWGOA to advertise and market the Fraudulent Vehicles to Plaintiffs.

15.     VWAG used its own employees and directed VWGOA to formulate and disseminate false information about the Fraudulent Vehicles from Michigan that forms the basis of this lawsuit.  VWAG required VWGOA to use false information about the Fraudulent Vehicles in marketing campaigns distributed in Michigan, and heavily promoted the launch of the Fraudulent Vehicles in Michigan (i.e. sponsoring Detroit Grand Prix to promote its fraudulent "Clean Diesel" technology).  VWAG employees came to Michigan to develop and promote these campaigns. For example, VWAG sent James Liang (a long-time VWAG employee at the time that he first began promoting "Clean Diesel" in the United States) to work in Michigan as the "Leader of Diesel Competence" and, classified him as a so-called "Foreign Service Employee" such that VWAG paid for his salary and expenses through VWGOA. Similarly, VWAG sent Oliver Schmidt (another long-time VWAG employee), who served as VWAG's head of its Environmental & Engineering Office ("EEO") in Ann Arbor, Michigan, who was in charge of all regulatory approvals of the Fraudulent Vehicles

from 2012 through February 2015, including the approvals for the 2014 Touareg TDI, which is same make, model and model year as the Vehicle purchased by Plaintiffs.

16.    VWAG's relationship with Volkswagen America goes far beyond that of a mere parent-subsidiary relationship.  VWAG exercises significant and total control over VWGOA's day-to-day operations in Michigan and exercised control over VWGOA in Michigan in directing and carrying out the fraud that forms the basis of this lawsuit.  Indeed, VWAG's control is so persistent and total that numerous courts across the country have found that VWGOA is the proper agent for service of process for VWAG.

17.    The entire Volkswagen Dieselgate scandal occurred as a result of VWAG's focused efforts to increase its market share in the United States.  In 2007, VWAG set goals for Volkswagen to become a world leader in automobile manufacturing, including tripling of the number of vehicles sold in the United States.   In order to sell the Fraudulent Vehicles in the United States and in Michigan and Maryland, VWAG appointed its wholly-owned subsidiary, VWGOA, to transact and manage the business affairs of importing, distributing, marketing and the sale of VWAG vehicles, including the Fraudulent Vehicles in the United States and in Michigan.  VWAG and VWGOA carried out a substantial portion of these activities from VWGOA's offices in Michigan.  VWAG sold the Fraudulent Vehicles, including the Vehicle purchased by Plaintiffs, through VWGOA for distribution throughout the United States.  All of this was accomplished, and the Vehicle at-issue in this case was sold to Plaintiffs, pursuant to an Improper Agreement between VWAG and VWGOA (the "Volkswagen Importer Agreement"). This Importer Agreement was not an arms-length transaction. VWAG required VWGOA to enter into these agreements.

18.    The Importer Agreement appoints VWGOA as the sole authorized U.S. importer and distributor of vehicles manufactured by VWAG. VWGOA agreed to assume responsibility for the importation, distribution, marketing and sale of Volkswagen and Audi vehicles, including the Fraudulent Vehicles. At VWAG's direction, VWGOA applied for and obtained the Certificates of Conformity, by and through VWGOA's EEO office in Michigan, that allowed VWAG to sell the Fraudulent Vehicles in the United States. As to the Fraudulent Vehicles, Volkswagen America carried out its duties and responsibilities to VWAG under the Importer Agreement, in large part, in Michigan at the direction of VWAG with VWAG's direct participation in Michigan.

19.    The Importer Agreement divides functions and promotes the common purpose of selling Volkswagen and Audi vehicles, including the Fraudulent Vehicles, throughout the United States. VWAG had the right and power to control the means and methods by which VWGOA performed its work in marketing, sales, promotion and public relations and did in fact exercise such power and control over VWGOA in Michigan. VWAG oversaw and controlled the details of VWGOA's marketing, sales, promotion and public relations concerning the Fraudulent Vehicles, some of which occurred in Michigan.

20.    The Importer Agreements required Volkswagen America to establish a dealer network based on VWAG and Audi AG's schedule and conditions. It was this extensive dealer network that allowed VWAG to sell over 600,000 of the Fraudulent Vehicles to unsuspecting consumers throughout the United States, including in Michigan and in Maryland where Plaintiffs purchased their Vehicle. Volkswagen America established this dealer network at the direction, and with the direct participation, of VWAG in, *inter alia*, Michigan.

21.     VWAG appointed VWGOA to transact and manage the business affairs of importing, distributing, marketing and the sale of the Fraudulent Vehicles, as well as other Volkswagen and Audi vehicles.  This activity was carried out by VWGOA, in part, in Michigan.  VWAG and VWGOA divided functions and worked together in Michigan for the common purpose of selling Volkswagen-branded and Audi-branded vehicles, including the Fraudulent Vehicles and the Vehicle at-issue in this lawsuit.  Pursuant to their agreements, VWAG had the right and power to control the means and methods by which VWGOA performed its work in the marketing, sales, promotion and public relations concerning the Fraudulent Vehicles.  VWAG could not conduct business in the United States or in Michigan without the assistance of VWGOA.  VWAG controls the methods and details of VWGOA's work in Michigan to such an extent that VWGOA is the agent of VWAG in Michigan.

22.     The following additional facts further demonstrate the total control VWAG exercises over VWGOA in Michigan making the subsidiary nothing more than a Michigan corporate division of VWAG:

- VWAG owns 100% of the outstanding stock of Volkswagen America;

- VWAG elects and controls the board of directors and the chairman of the board of directors of VWGOA;

- VWGOA is the sole authorized U.S. importer and distributor of vehicles manufactured by VWAG, many of which are then distributed by VWGOA in Michigan;

- From VWGOA's offices in Michigan, VWGOA officials participated in the obtaining of the Certificates of Conformity that allowed VWAG to sell their vehicles, including the Fraudulent Vehicles, in the United States and in Michigan;

- VWGOA is required to, and does in fact, promote the image and reputation of VWAG, which occurs, in part, in Michigan;

- VWGOA is prohibited by VWAG from modifying any of VWAG's vehicles, including the Fraudulent Vehicles, without VWAG's prior written approval;

- VWAG is authorized by VWGOA to control the means and methods by which VWGOA marketed and sold VWAG vehicles, including the Fraudulent Vehicles. VWAG exercises this control, in part, at and through VWGOA's offices in Michigan. A significant portion of the false and misleading representations about the Fraudulent Vehicles were developed in, and disseminated from, Michigan;

- VWGOA is prohibited by VWAG from selling, marketing or promoting vehicles manufactured by companies other than VWAG and Audi AG;

- Volkswagen America is required by VWAG to sell and service used cars at its U.S. dealerships and to take used cars in trade;

- VWAG determines the warranty offered on the cars sold by VWGOA, including the warranty offered on the Fraudulent Vehicles and on the Vehicle at-issue in this lawsuit;

- VWGOA is required by VWAG to lease cars, which included some of the Fraudulent Vehicles;

- VWGOA is required to establish marketing and public relations objectives and strategies within the guidelines established by VWAG. These objectives and strategies using false information to market the Fraudulent Vehicles;

- VWAG controls VWGOA's advertising content as well as how much money it spends on advertising, including advertising concerning the Fraudulent Vehicles. VWAG further controls the funding of the budget for VWGOA's EEO office in Michigan;

- VWGOA is required by VWAG to make warranty repairs on all VWAG and Audi AG vehicles, including the Fraudulent Vehicles, in accordance with VWAG's guidelines and procedures;

- VWGOA is required by VWAG to use the workshop tools and equipment specified by VWAG to service vehicles, including the Fraudulent Vehicles;

- VWGOA is required by VWAG to perform all repairs and maintenance work in accordance with VWAG's guidelines and procedures;

- VWGOA is required to perform its pre-delivery inspections of VWAG vehicles, including the Fraudulent Vehicles, according to VWAG's instructions and guidelines;

- VWGOA is required to ensure that its standardized data processing and communications programs are compatible with VWAG's standardized data processing and communications programs;

- VWGOA is required to maintain a modern computer communications system for processing warranty claims that is compatible with VWAG's system to enable VWAG to track warranty cost projections;

- VWGOA is required to submit to VWAG on a regular basis information requested by VWAG concerning business data, warranty and warranty related matters, enactments or changes of any relevant laws and regulations, including taxes and customs and any other matters which may affect any aspect of their Importer Agreement;

- VWGOA is required to inform VWAG of any modification of U.S. laws which may affect the manufacturing of vehicles and regulations governing the use thereof including safety requirements;

- VWGOA provides regular reports to VWAG on the development of the market generally and its business activities in the U.S., including reports on the Fraudulent Vehicles. VWGOA provides some of this information to VWAG from its offices in Michigan;

- VWGOA and VWAG determine the profit margin VWGOA received on the sale of the Fraudulent Vehicles; and

- VWGOA cannot, without written approval of VWAG, enter into any agreements or arrangements to promote the sale of goods or services from its business premises unless such activities do not affect in any regard VWAG's business interests.

23.    One of the many ways that VWAG directly managed and controlled VWGOA's affairs in Michigan, including the fraud that forms the basis for this lawsuit, is through an expatriate program wherein VWAG and Audi AG officers and employees were assigned to work for VWGOA at VWGOA's Michigan offices, including James Liang and Oliver Schmidt. VWAG and Audi AG employees came to VWGOA's offices in Michigan and directed, controlled, and participated in the fraud that forms the basis of this lawsuit. VWAG further uses VWGOA's offices in Michigan to further its business interests including the marketing, sale, and distribution of the Fraudulent Vehicle to Plaintiffs.

24.     In furtherance of the "Dieselgate" fraud, VWAG developed technical service "flash" software that was designed to help hide the presence of the Cheat Device. VWAG labeled the software as an "update," provided this update to VWGOA, and directed VWGOA to install the software on the Fraudulent Vehicles unbeknownst to U.S. consumers and Plaintiffs.

## Audi AG

25.     Personal jurisdiction over Audi AG in Michigan is proper because: (a) Audi AG transacts business in Michigan by virtue of its relationship with VWGOA and by virtue of its importing Audi-branded automobiles offered for sale in Michigan to consumers; (b) Audi AG contracts with VWGOA to supply goods and services in Michigan; (c) Audi AG uses VWGOA's offices in Michigan to further its business interests; (d) VWGOA's actions in and contacts with Michigan can be imputed to Audi AG because of the agency relationship between those parties; and (e) VWGOA's actions in and jurisdictional contacts with Virginia are imputed to Audi AG by virtue of the Joint Venture.

26.     Personal jurisdiction over Audi AG is proper because of Audi AG's own direct contacts with the state of Michigan concerning the fraud that forms the basis of this lawsuit. Personal jurisdiction over Audi AG is further proper because the Michigan contacts of Volkswagen America and Volkswagen AG concerning the fraud that forms the basis of this lawsuit can be imputed to Audi AG pursuant to the agency relationship between and among the parties, alter ego, conspiracy theory, and by virtue of the Joint Venture.

27.     As set forth below, Volkswagen America is the agent, both actual and implied, of Audi AG and was Audi AG's agent as to the marketing, promotion, sale and distribution of the Fraudulent Vehicles in the United States and in Michigan. Volkswagen America carried

out the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in Michigan as Audi AG's agent. Volkswagen America's actions in, and contacts with, Michigan can be imputed to Audi AG because of the agency relationship between and among those parties.

28.     As set forth below, VW America is the alter ego of Audi AG because there is (1) a unity of interest and ownership between Audi AG and VW America; and (2) Audi AG used VW America to evade a personal obligation in Michigan and Maryland, to perpetrate fraud or a crime in Michigan and Maryland, and to commit an injustice in Michigan and Maryland, and to gain an unfair advantage in Michigan and Maryland. Audi AG used VW America as its alter ego for the marketing, promotion, sale, and distribution of the Fraudulent Vehicles in the United States and in Virginia. VW America, a wholly owned subsidiary of the parent company of Audi AG with offices in Michigan, exists solely to promote the sale and distribution of Volkswagen AG and Audi AG products, including the Fraudulent Vehicles, in the United States and Michigan. VW America's actions in, and contacts with, Michigan can be imputed to Audi AG pursuant to an alter ego theory.

29.     Volkswagen America's and Volkswagen AG's actions in and jurisdictional contacts with Michigan are imputed to Audi AG by virtue of the Joint Venture.

30.     Even without attributing the contacts of Volkswagen America to Audi AG, personal jurisdiction would still be proper over Audi AG because of Audi AG's own contacts with Michigan. Audi AG sold the Fraudulent Vehicles to Volkswagen America, with offices in Michigan, with the knowledge and intent that Volkswagen America would resell and distribute them to consumers throughout the United States. Further, Audi AG worked with and directed Volkswagen America in Michigan to advertise and the market the Fraudulent

Vehicles to consumers, including promotion of the engine developed by Audi AG for the 3.0-liter Fraudulent Vehicles. Audi AG used its own employees and directed Volkswagen America and Audi America to formulate and disseminate false information about the Fraudulent Vehicles from Michigan (i.e. Audi dispatched Audi of America then-President Johan de Nysschen to Michigan to promote the fraudulent "Clean Diesel" technology during the 2008 or 2009 Detroit Grand Prix).

31.     Audi AG not only directed Volkswagen America and Audi of America employees in Michigan to carry out the fraud, but Audi AG sent its own employees to Michigan to carry out and perpetrate the fraud that forms the basis of this lawsuit.  Audi AG required Volkswagen America to use false information about the Fraudulent Vehicles in false compliance reports and applications for certificate of conformity to allow the Fraudulent Vehicles to be sold, which was submitted by and through VWGOA's EEO office in Michigan.  Audi AG exercises significant control over Volkswagen America's day-to-day operations in Michigan with respect to the Fraudulent Vehicles and exercised control over Volkswagen America and Audi of America in Michigan in directing and carrying out the fraud that forms the basis of this lawsuit.

32.     In order to sell the Fraudulent Vehicles in the United States and Michigan and Maryland, Audi AG appointed Volkswagen America to transact and manage the business affairs of importing, distributing, marketing and the sale of Audi AG vehicles in the United States, including the Fraudulent Vehicles.  Pursuant to this agreement, Audi AG sold hundreds of thousands of vehicles to Volkswagen America, for dissemination throughout the United States and Michigan and Maryland.  Among those vehicles were the Fraudulent Vehicle purchased by Plaintiffs herein in Maryland.  This was accomplished pursuant to an

Importer Agreement between Audi AG and Volkswagen America, which appointed Volkswagen America as the sole authorized U.S. importer and distributor of vehicles manufactured by Audi AG, including the Fraudulent Vehicles.  Volkswagen America agreed to assume responsibility for the importation, distribution, marketing and sale of Audi AG's vehicles, including the Fraudulent Vehicles.  Volkswagen America was the sole authorized U.S. importer and distributor of vehicles manufactured by Audi AG.  From its offices in Michigan, Volkswagen America participated in obtaining the Certificates of Conformity that allowed Audi AG to sell the Fraudulent Vehicles. Volkswagen America carried out its duties and responsibilities to Audi AG under the Audi Importer Agreement, in part, in Michigan at the direction of Audi AG, and with its direct participation in Michigan.

33.   By agreement, Audi AG and Volkswagen America divided functions and worked together for the common purpose of selling the Fraudulent Vehicles.  Pursuant to their agreement, Audi AG had the right and power to control the means and methods by which Volkswagen America performed its work in marketing, sales, promotion and public relations and did in fact exercise such power and control and control over Volkswagen America in Michigan. Audi AG oversaw and controlled the details of Volkswagen's America's marketing, sales, promotion and public relations concerning the Fraudulent Vehicles, some of which occurred in Michigan.

34.   The Importer Agreement between Audi AG and Volkswagen America required Volkswagen America to establish a dealer network based on Audi AG's schedule and conditions.  Volkswagen America established this dealer network at the direction, and with the direct participation, of Audi AG in Michigan.

35.     Audi AG could not conduct business in the United States or Michigan or Maryland without the assistance of Volkswagen America.  Audi AG controls the methods and details of Volkswagen America's work in Michigan to such an extent that Volkswagen America is the agent of Audi AG in Michigan and through the remainder of the United States.

36.     The following additional facts further demonstrate the control Audi AG exercises over Volkswagen America, making the subsidiary nothing more than a corporate division of Audi AG.

- Audi AG appoints, oversees, and controls officers and managers of directors of Volkswagen America responsible for the distribution of Audi AG vehicles in Michigan;

- Volkswagen America is the sole authorized U.S. importer and distributor of vehicles manufactured by Audi AG and imported and distributed in the United States and in Michigan;

- From VWGOA's offices in Michigan, Volkswagen America officials participated in the obtaining of the Certificates of Conformity that allowed Audi AG to sell its vehicles, including the Fraudulent Vehicles, in the United States and in Michigan and Maryland;

- Volkswagen America is required to, and does in fact, promote the image and good reputation of Audi AG, which occurs, in part, in Michigan and in Maryland and was done in furtherance of the fraud that forms the basis for this lawsuit;

- Volkswagen America is prohibited by Audi AG from modifying any of Audi AG's vehicles, including the Fraudulent Vehicles, without its prior written approval;

- Audi AG is authorized by Volkswagen America to control the means and methods by which Volkswagen America marketed and sold Audi AG's vehicles, including the Fraudulent Vehicles. Audi AG exercises this control at and through Volkswagen America's offices in Michigan. Some of the false and misleading representations about the Fraudulent Vehicles were developed in, and disseminated from, Michigan;

- Volkswagen America is prohibited by Audi AG from selling, marketing or promoting vehicles manufactured by companies other than Audi AG and VWAG;

- Volkswagen America is required by Audi AG to sell and service used cars at its U.S. dealerships and to take used cars in trade;

- Audi AG determines the warranty offered on the cars sold by Volkswagen America, including the warranty offered on the Fraudulent Vehicles;

- Volkswagen America is required by Audi AG to lease cars;

- Volkswagen America is required to establish marketing and public relations objectives and strategies within the guidelines established by Audi AG;

- Audi AG controls Volkswagen America's advertising content as well as how much money it spends on advertising, including advertising concerning the Fraudulent Vehicles;

- Volkswagen America is required by Audi AG to make warranty repairs on all Audi AG vehicles, including the Fraudulent Vehicles, in accordance with Audi AG's guidelines and procedures;

- Volkswagen America is required by Audi AG to use the workshop tools and equipment specified by Audi AG to service vehicles, including the Fraudulent Vehicles;

- Volkswagen America is required by Audi AG to perform all repairs and maintenance work in accordance with Audi AG's guidelines and procedures;

- Volkswagen America is required to perform its pre-delivery inspections of Audi AG's vehicles, including the Fraudulent Vehicles, according to Audi AG's instructions and guidelines;

- Volkswagen America is required to ensure that its standardized data processing and communications programs are compatible with Audi AG's standardized data processing and communications programs;

- Volkswagen America is required to maintain a modern computer communications system for processing warranty claims that is compatible with Audi AG's system to enable Audi AG to track warranty cost projections;

- Volkswagen America is required to submit to Audi AG on a regular basis information requested by Audi AG concerning business data, warranty and warranty related matters, enactments or changes of any relevant laws and regulations, including taxes and customs and any other matters which may affect any aspect of their import agreement;

- Volkswagen America is required to inform Audi AG of any modification of U.S. laws which may affect the manufacturing of vehicles and regulations governing the use thereof including safety requirements;

- Volkswagen America provides regular reports to Volkswagen AG and Audi AG on the development of the market generally and its business activities in the U.S., including reports on the Fraudulent Vehicles. Volkswagen America provides such information to Audi AG, in part, from its offices in Michigan;

- Volkswagen America and Audi AG determine the profit margin Volkswagen America received on the sale of the Fraudulent Vehicles, as well on its sale of other Audi cars; and

- Volkswagen America cannot, without written approval of Audi AG, enter into any agreements or arrangements to promote the sale of goods or services from its business premises unless such activities do not affect in any regard Audi AG's business interests.

37. One of the many ways that Audi AG managed and controlled Volkswagen America's affairs in Michigan, including the fraud that forms the basis of this lawsuit, is having officers and employees of Volkswagen America report to officials at Audi AG. Employees of VWGOA would regularly interact, and obtain information from, Audi AG in submitting required reports to regulators, much of which was false as it related to the Fraudulent Vehicles.

38. Audi AG exercised direct supervisory control over Volkswagen America in Michigan. For example, after the "Dieselgate" scandal broke into the public, Audi AG provided false information to Volkswagen America in Michigan that 3.0-liter vehicles did not contain cheat devices and directed Volkswagen America to disseminate that information to Plaintiffs and the U.S. public.

39. One of the many ways that Audi AG directly managed and controlled Volkswagen America's affairs in Michigan, including the fraud that forms the basis of this lawsuit, is through an expatriate program wherein Audi AG officers and employees were assigned to work for Volkswagen America at Volkswagen America's corporate headquarters in Fairfax County, Virginia, or at VWGOA's offices in Michigan. Audi AG employees came to

Volkswagen America's offices in both Virginia and Michigan and directed, controlled, and participated in the fraud that forms the basis of this lawsuit. Audi AG's expatriate officers and employees in Virginia oversaw Volkswagen America's operations, including its marketing, promotion, and distribution of the Fraudulent Vehicles. Audi AG used German expatriates to manage and control Volkswagen America's operations in Michigan, including the dissemination of false or misleading information regarding the legality of the Vehicle to Plaintiffs.

40.  Audi AG uses Volkswagen America's offices in Michigan to further its business interests, including obtaining the required approval to allow the Fraudulent Vehicles to be sold in the United States.

## SUBJECT MATTER JURISDICTION

41.  This Court has subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, given that several of Plaintiffs causes of action asserted herein, including claims under the Magnuson Moss Warranty Act ("MMWA"), as well as claims under the Racketeering Influence and Corruption Act ("Federal RICO" or "RICO"), arise under the laws of the United States.

42.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, given that each defendant is a resident and citizen of a different state that the Plaintiffs, and given that the amount in controversy herein exceeds $75,000.00.

43.  This Court also has supplemental jurisdiction over Plaintiffs' state-law claims asserted herein pursuant to 28 U.S.C. § 1367.

## VENUE

44.    A substantial part of the events or omissions giving rise to the claims at-issue herein occurred in Michigan, given that the fraudulent representations regarding the Cheat Device, which enabled Volkswagen to obtain Certificates of Conformity to sell the at-issue Fraudulent Vehicles, which would not have issued the absence of fraud, occurred in Michigan by and through VWGOA's EEO office.

## FACTUAL BACKGROUND

### The Deceptive Emissions Scheme

45.    This lawsuit is about a fraudulent scheme to deliberately lie, cheat and intentionally deceive consumers about the characteristics, benefits and value of certain diesel automobiles falsely promoted by Volkswagen as high performing, environmentally friendly, and clean. (the "Deceptive Emissions Scheme" or the "Diesel Fraud").

46.    The 2.0 liter diesel vehicles involved in the Deceptive Emissions Scheme (the "2.0 Liter Affected Vehicles") are as follows: Volkswagen Jetta TDI (Model Years 2009 – 2015), Volkswagen Jetta SportWagen TDI (Model Years 2009 – 2014), Volkswagen Golf TDI (Model Years 2010 – 2015), Volkswagen Golf SportWagen TDI (Model Year 2015), Volkswagen Beetle TDI (Model Years 2013 – 2015), Volkswagen Beetle Convertible TDI (Model Years 2013 – 2015), Volkswagen Passat TDI (Model Years 2012 – 2015), and the Audi A3 (Model Years 2010 – 2013, 2015). The 3.0 liter diesel vehicles involved in the Deceptive Emissions Scheme (the "3.0 Liter Affected Vehicles") are as follows:  Audi A6 Quattro (Model Years 2014 – 2016), Audi A7 Quattro (Model Years 2014 – 2016), Audi A8L (Model Years 2014 – 2016), Audi Q5 (Model Years 2014 – 2016), Audi Q7 (Model Years 2009 – 2015), and the Volkswagen Touareg (Model Years 2009 – 2016). The 2.0

Liter Affected Vehicles and the 3.0 Liter Affected Vehicles are collectively referred to herein as the "Fraudulent Vehicles".

47.    The centerpiece of the Deceptive Emissions Scheme was the use of a secretly embedded software algorithm in the Fraudulent Vehicles that was designed and installed to cheat emissions tests (the "Cheat Device"), thereby fooling governmental regulators into approving the Fraudulent Vehicles for sale and thereby tricking and defrauding consumers into buying and/or leasing vehicles.

48.    The Cheat Device detects when the dirty diesel engines in the Fraudulent Vehicles are being tested in a laboratory and triggers performance-sapping controls to simulate compliance with emission laws when under testing conditions. But when the test ended, and the driver returned to the road under normal operation and use, the performance-and the illegal pollution-returned. In short, the Defendants figured out a computer-driven methodology and technique to cheat the emissions system – simply run the vehicle in an eco-friendly compliant mode when being tested and in normal dirty-diesel mode when being driven by consumers. Plain and simple: it was an intentional plan, scheme and design to lie and cheat consumers, including the Plaintiff.

49.    For years, the Defendants got away with the Deceptive Emissions Scheme, including the Cheat Device, without detection as the Fraudulent Vehicles were sold at record numbers into the U.S. stream of commerce. Once out of the testing facilities and on the roads, these cars spewed harmful nitrogen oxide ("NOx") pollutants into the air at a rate of up to 40 times the legal limit. All the while, the Fraudulent Vehicles were marketed to U.S. consumers, including Plaintiff, by Volkswagen which claimed to be the world's foremost innovator of "clean" diesel technology, duping hundreds of thousands of environmentally-

conscious consumers who were willing to pay a premium for "clean" diesel vehicles, including Plaintiff.

50.     Believing the aggressive marketing campaigns and the promises of low-emissions, environmentally-friendly diesel vehicles, with high fuel economy and exceptional performance, consumers, including Plaintiff, believed the hype and acquired the Fraudulent Vehicles in record numbers. The Deceptive Emissions Scheme was hugely successful.  Of course, at the same time – known to the Defendants but not known to the Plaintiff – the Defendants secretly turned the most environmentally-conscious consumers into some of the biggest polluters on the road – and charged them a premium in the process.

51.     Plaintiff acquired one of the Fraudulent Vehicles based on the patently false representations by Volkswagen that the vehicles were "clean" with low emissions, were environmentally friendly, and complied with federal, state and local emissions laws and regulations.

52.     All Defendants in this lawsuit played a role and participated in the Deceptive Emissions Scheme, including the creation, use and deception related to the Cheat Device.

53.     The Deceptive Emissions Scheme, including the Cheat Device, was intentionally designed by Volkswagen to defraud and cheat consumers, including Plaintiffs, which it did.

## The Plot to Dominate the Automotive Market

54.     In 2005, Volkswagen made a strategic decision to launch a large-scale promotion of diesel vehicles in the United States.  While other automakers focused on hybrid or hydrogen-fueled vehicles, Volkswagen pivoted toward "clean" diesel technology as its primary strategy to reach the growing market of environmentally-conscious consumers.

55.     This was to be achieved, in part, through an Audi-branded line of so-called "Clean Diesel" vehicles that included a 6-cylinder 3.0-liter diesel engine. This V6 3.0 TDI engine was first

introduced at automotive shows across the United States for model year 2009, which engine Volkswagen represented to be, "The Cleanest Diesel in the World".

56.     Behind the scenes, however, Volkswagen realized internally that it was not possible to roll out these so-called "clean" diesel vehicles within its self-imposed budgets and engineering constraints.  Rather than admit defeat, Volkswagen made the conscious decision to cheat and implemented the Deceptive Emissions Scheme.

### The Deceptive Marketing

57.     Volkswagen's "clean" diesel campaign was its key selling point for consumers increasingly concerned about the environment.  Its marketing mission was to "get clean-diesel power the recognition it deserves as a true 'green' technology," thereby growing Volkswagen's market share to match Volkswagen's lofty sales goals.

58.     Volkswagen specifically targeted the environmentally conscious in its marketing campaign.  For example, on September 26, 2007, Volkswagen launched what it called the "Dieselution Tour," a mobile interactive marketing exhibit traveling across the United States on a 4-month tour, making stops at environmental and alternative fuel festivals, auto shows and the 2008 Super Bowl. The exhibit included, among other things, a "Sustainability Station, involving an interactive quiz and a Carbon Footprint Calculator." On October 3, 2007, then-VWGOA CEO Stefan Jacoby stated, "Volkswagen of America considers the Dieselution Tour an important informational resource for citizens who are concerned about the environment as well as fuel economy standards. We want to show Americans that today's clean diesel technology is a quantum leap from the power-plants introduced nearly 30 years ago. This tour aims to change any negative or outdated perception about diesel technology."

59.   The interactive marketing exhibit described in the foregoing paragraph was misleading because it suggested that Volkswagen's line of "Clean Diesel" TDI vehicles were environmentally friendly, when in fact, they are not.

60.   Dubbing these diesel engines contained in the Fraudulent Vehicles as "Clean Diesel" was a symptom of the brazen arrogance underlying the fraud.  Volkswagen's entire marketing campaign, from the branding of the products to the advertisements, focused on convincing consumers that the Fraudulent Vehicles were not merely compliant with emissions regulations, but that they exceeded them. This deception culminated in a Guinness World Record attempt in a 2013 Volkswagen Passat TDI, which ironically won an award for "lowest fuel consumption – 48 U.S. states for a non-hybrid car."

61.   Volkswagen professed that its diesel-based technology was equal or superior to hybrid and electric options offered by its competitors. As described by Mark Barnes, COO of VWGOA, when asked, "What is the advantage of a diesel over a hybrid?"

It's a fantastic power train. It gives very good fuel economy.  It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, a very clean running engine. Clean enough to be certified in all 50 states. It's just like driving a high-powered gasoline engine so you are not giving up one bit of the driving experience that you'd expect from a regular gasoline engine.

62.   The statement made in the foregoing paragraph was false when made.

63.   On or about March 15, 2007, Volkswagen, as part of the annual report of its parent company, described it so-called "Clean Diesel" technology as "[a]n innovative and advanced system that keeps CO2 emissions particularly low while at the same time avoiding 90% of NOx emissions will soon be introduced to the market: the 'Clean TDI.' . . . 'Clean TDI' is an especially clean, low-consumption diesel engine by Volkswagen."

64.   The statement made by Volkswagen that its "Clean Diesel" technology could keep "CO2 emissions particularly low while at the same time avoiding 90% of NOx emissions" was false at the time it was made, as was the statement by Volkswagen that "'Clean TDI' is an especially clean, low-consumption diesel engine by Volkswagen."

65.   The repeated use of the term "clean" by Volkswagen in referring to the Fraudulent Vehicles was misleading at the time it was made.

66.   In a Volkswagen brochure entitled: "Smarter. Safer. Greener. This is Our American Journey" Volkswagen included a section entitled, "Environmental Stewardship" in which it states that "environmental stewardship has always been an integral part of our business" and then asserts that "our low consumption, low emissions powertrains" are evidence that "we are maximizing sustainability and environmental acceptability."

67.   The statement by Volkswagen that its "Clean Diesel" TDI line of vehicles produced "low emissions" was false when made.

68.   Volkswagen distinguished the TDI "clean" diesel engines from other "stinky, smoky, sluggish" diesels, proclaiming its "eco-conscious" status, but failing to disclose that the Fraudulent Vehicles were "dirty" themselves.   These messages were prevalent in Volkswagen's extensive marketing campaign.

69.   Some advertisements, for example, specifically emphasized the low emissions and eco-friendliness of the vehicles by claiming that they had "ultra-low emissions" and "less fuel consumption and added engine power."   Other ads boasted that "a little fuel goes a long way."

70.   Yet others addressed the full package, implying that in contrast to the "stinky, smoky, and sluggish" diesel vehicles of old, Volkswagen's new diesel vehicles were clean, efficient,

and powerful all at once. For example, Volkswagen boasted, "Diesel has really cleaned up its act. Find out how clean diesel technology impacts fuel efficiency and performance while also being a more eco-conscious choice." In another advertisement, Volkswagen claimed, "This ain't your daddy's diesel. Stinky, smoky and sluggish. Those old realities no longer apply. Enter TDI Clean Diesel. Ultra-low sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel."

71.     In addition, Volkswagen directed consumers to the www.clearlybetterdiesel.org website, which partnered with affiliates Audi and Porsche, as well as Bosch, Mercedes and BMW. This website touted the benefits of newly developed diesel technology as "clean" and environmentally friendly. Although it has been scrubbed of all content, the website previously contained false and misleading statements, such as:

MORE INFORMATION

The term 'Clean Diesel" refers to innovative diesel engine technology, as well as the latest diesel fuel for vehicles in contrast to traditional diesel. Clean Diesel is superior, since both the new generation of engines and the fuel itself meet the strictest emission regulations in the U.S. (issued by the state of California). Clean Diesel fuel contains less than 15 parts per million of sulfur: our Clean Diesel partner vehicles deliver on average 18% higher fuel efficiency while reducing $CO_2$ emissions when compared to corresponding gas models. Since Clean Diesel is not only cleaner but also more fuel efficient, the new Clean Diesel vehicles are friendlier to both the environment and drivers' wallets throughout the U.S.

72.     The website also offered a graphic slider, specifically representing that "clean" diesel produced less emissions and dramatically reduced smog.

73.     Volkswagen also produced a series of television advertisements for the U.S. market, intended to debunk myths about diesel engines. One ad, titled "Three Old Wives Talk Dirty," featured three elderly women debating whether diesels, though "beautiful," are dirty vehicles. In it, they claimed, "Old Wives' Tale #6: Diesel is Dirty." To ostensibly

debunk the "Old Wives' Tale" that diesel produced dirty exhaust and hazardous emissions, one of the women held her white scarf to the exhaust to convince the passengers that the exhaust was environmentally friendly, and not, in fact, dirty.  She removed the scarf, gestured at it, and asked her friends, "See how clean it is?"

74.   Like others in Volkswagen's "clean" diesel campaign, this ad misleadingly portrayed the exhaust emissions from the Fraudulent Vehicles as clean and safe.  In reality the Fraudulent Vehicles actually emit invisible and extremely hazardous levels of NOx.

75.   Volkswagen further published other videos and television commercials that were misleading by suggesting that its TDI line of vehicles were "clean" or environmentally friendly or could otherwise achieve certain efficiencies that were not possible while also complying with applicable law.  A non-exhaustive list of such commercials/videos, with approximate dates of first publication, is attached hereto as Exhibit A and incorporated herein by reference.

76.   Volkswagen engaged in similar advertising with respect to the Audi-branded TDI vehicles, falsely touting the "eco-friendly" characteristics of its diesel technology. One ad, "The Green Police" (which aired during the 2010 Super Bowl) portrayed a world in which the environmental police ("Green Police") arrested people for using Styrofoam cups, failing to compost, asking for plastic bags at the grocery store, throwing out batteries, and drinking water from plastic bottles. And at a highway checkpoint, the "ECO ROADBLOCK," the Green Police flagged cars that were harmful to the environment.  When the Green Police at the ECO ROADBLOCK see an Audi A3 TDI SportWagen, they give the car a "thumbs up" and allow the driver to bypass the roadblock.  After the white A3 TDI cruises past the

other vehicles, the screen fades to black and falsely touts the supposed "green credentials"

of the A3 TDI. 337.

77.     These themes extended to print brochures at dealerships and to Volkswagen's website.  For

example, a "2012 Volkswagen Family" brochure for all Volkswagen models for that year

states:

> Let TDI "clean" diesel set you free from the filling station. Our TDI engines achieve astonishing mileage and range—up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance.  **That's all thanks to the TDI technology that uses a direct injection system and runs on ultra low-sulfur diesel, helping reduce sooty emissions by up to 90% compared to previous diesel engines.** On most models, you can even choose the available DSG automatic transmission with Tiptronic to take that turbo engine to a whole new level.  (Emphasis added).

78.     And a 2012 "Volkswagen TDI Clean Diesel" brochure for the six models of Volkswagen

TDIs then on the market (Jetta, Jetta Sportwagen, Golf, Passat, Beetle, and Touareg) states:

> These are not the kind of diesel engines you find spewing sooty exhaust like an old 18-wheeler. Clean diesel vehicles meet the strictest EPA standards in the U.S. Plus, TDI technology helps reduce sooty emission by up to 90%, giving you a fuel-efficient and eco-conscious vehicle.
>
> ***
>
> Think beyond green. TDI represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging eco-conscious products and behaviors. Join us in being more responsible on the road and on the planet.

79.     Similarly, a "2013 Volkswagen Family" brochure, applicable to all models, states:

> When you've had your fill of filling stations, hit the road in your TDI "clean" diesel Volkswagen.  These engines achieve astonishing mileage and range-up to 43 highway mpg and 795 miles on a single tank without sacrificing one bit of turbocharged performance. **That's all thanks to the TDI technology that uses a direct injection system, and runs on ultra-low sulfur diesel, helping reduce emissions by up to 90% compared to previous diesels.** Far and away, it's our best diesel yet.  (Emphasis added).

80.   In a press release introducing the 2015 Touareg TDI "Clean Diesel", which was published

by Volkswagen for use by media outlets and intended to reach prospective customers, in

referring to the 3.0 Liter diesel engine contained in the 2015 Touareg TDI (the same engine

contained in the Plaintiff's vehicle), Volkswagen stated:

> To achieve its 50-state emissions qualification, the 2015 Touareg is equipped with
> a deNOx catalytic converter augmented by a special injection system that sprays
> AdBlue® into the exhaust, helping to reduce NOx emissions. Thanks to this, the
> TDI meets ULEV/Tier 2, BIN 5 standards imposed across all 50 states.

81.   Volkswagen also made similar false representations relating to its Audi-branded vehicles

in print brochures available at dealerships and the Audi website. For example, a TDI "Clean

Diesel Technology" brochure that Defendants published in 2009 relating to its Audi-

branded vehicles, states:

> The **world's cleanest diesel technology** is the result of not just one innovation, but
> several. For instance, turbocharging with direct injection allows the engine to do
> more by maximizing air intake for enhanced performance while reducing
> emissions. Those emissions are further reduced by a revolutionary ultra-low
> emissions system with AdBlue®. **The system scrubs the exhaust, producing
> smoke-free emissions that rival gasoline powered cars, making it legal in all 50
> states.** And since the typical diesel engine sound has been eliminated, you'd be
> hard-pressed to tell it's a diesel at all. (Emphasis added).

82.   Similarly, an Audi 2011 A3 TDI brochure states:

> With the potent combination of direct diesel injection and turbocharging, the 2.0-
> liter TDI® clean diesel engine delivers an impressive 236 lb-ft. of torque and
> produces 140hp. The power and performance is complemented with impressive
> EPA-estimated 30 MPG city and 42 MPG highway ratings. Producing 30 percent
> fewer CO2 emissions than a comparable gasoline engine, the 2.0 TDI clean diesel
> also meets or exceeds the 50 state emissions requirements. . . . Long gone are the
> days of dirty, smoking diesel engines. Audi TDI clean diesel technology is
> responsible for the cleanest diesel engines in the world, with 30 percent fewer CO2
> emissions than comparable gasoline engines, making it an environmentally friendly
> alternative to gasoline power. In fact, TDI clean diesel is compliant with California
> 's ULEV II requirement—the world's most stringent emission standard. The result
> is a significant reduction in emissions that contribute to global warming.

83. Volkswagen was consistent in publishing these types of false statements in its marketing materials each model year across all of its "Clean Diesel" lines of vehicles, whether Audi-branded or otherwise.  For example, in the official marketing brochure for the 2014 Audi Q5, which was published by Volkswagen for use by prospective customers, in referring to the engine contained in the 2014 Audi Q5 TDI diesel, Volkswagen stated, "The Audi TDI® clean diesel engine has achieved ultra-low emissions vehicle [] status in all 50 states while producing approximately 20% fewer $CO_2$ emissions than the traditional gasoline-fueled engine."

84. Volkswagen repeated similar false claims on social media including Facebook, Twitter and YouTube misleadingly suggesting that the Fraudulent Vehicles were "clean" or otherwise "environmentally friendly."

85. Volkswagen provided training materials to its network of dealers (who at all relevant times herein acted as Defendants' authorized agents in selling the at-issue Fraudulent Vehicles) to teach its sales people to repeat the types of misrepresentations set forth herein, such as falsely claiming that the Fraudulent Vehicles generated "low emissions" and that such cars were "especially clean," "environmentally friendly," and "green" and that one would be "eco-conscious" by purchasing such a vehicle.  Volkswagen strictly controlled the marketing methods of its dealers to ensure that these false messages were ultimately conveyed to prospective customers, including Plaintiff.

86. Volkswagen made similar false representations regarding its Fraudulent Vehicles as being "especially clean" "green" having "low emissions" meeting emissions laws "in all 50 states" and generally being "environmentally friendly" to third-party reviewers of the

Fraudulent Vehicles (e.g. Car & Driver Magazine), which republished such false statements further perpetrating the misrepresentations initiated by Volkswagen.

87.     For Fraudulent Vehicles model year 2013 and newer, Volkswagen also included a "Smog" rating on the window sticker of such vehicles, rating each such vehicle as a "5" on a scale of 1 through 10 to purportedly allow consumers to make a comparison as to the environmental friendliness of the Fraudulent Vehicles with other vehicles.  The "5" rating corresponds to NOx emissions that must be limited to, on average, 0.05 grams per mile. None of the Fraudulent Vehicles met this standard at the time these representations were made.

**Fraudulent Concealment**

88.     Volkswagen misrepresented to government regulators that the Fraudulent Vehicles complied with applicable emissions law, which enabled Volkswagen to obtain the requisite certificates that allowed those vehicles to be placed for sale with Volkswagen's network of dealers in the United States, and ultimately sold to the public.

89.     Volkswagen failed to disclose to government regulators, as it was required to do, that the Fraudulent Vehicles were equipped with a Cheat Device, at the time it made application for such certification.

90.     Volkswagen knew that by concealing the Cheat Device from government regulators in its applications to allow such vehicles to be sold in the United States, a certificate allowing the sale of such vehicles would issue, which, albeit invalid, would lead the public to believe that the Fraudulent Vehicles were properly offered for sale.  Therefore, by making misrepresentations to government regulators, Volkswagen knew that it was misrepresenting the characteristics of its products to the consuming public.

91.     The representations in the foregoing paragraph were false. Volkswagen sought to conceal the falsity of such statements with the Cheat Device, which itself was designed to conceal other flaws within the emissions system on the Fraudulent Vehicles (e.g. failure of certain components to meet applicable durability standards).

92.     In addition, Volkswagen implemented a second cheating strategy to defeat the on-board diagnostic system (the "OBD Cheat") in a further attempt to conceal the Cheat Device.

93.     The OBD System, when operating properly, will cause a malfunction indicator lamp ("MIL") to illuminate on the instrument panel/dash of the vehicle to notify the driver when an abnormality is detected in, *inter alia*, the vehicles' emissions systems.

94.     Volkswagen implemented the OBD Cheat to ensure that such customer notification would not occur when the Cheat Device caused the Fraudulent Vehicles' emissions systems to operate in "road mode" (as opposed to "test mode" or "lab mode") or when the Cheat Device would otherwise cause the Fraudulent Vehicles to produce emissions that exceeded applicable legal limits.

95.     The OBD Cheat had the further effect of avoiding detection of the Cheat Device during the process utilized in most states' vehicle inspections, which rely upon the illumination of the MIL light and the corresponding emissions' codes that should be generated to determine if an emissions' problem exists.  By implementing the OBD Cheat, then, Volkswagen circumvented state emissions and inspection testing that such vehicles would have otherwise failed.

96.     As the Fraudulent Vehicles began to age, they experienced higher rates of warranty claims for parts and components related to the emissions control systems.   Some within

Volkswagen believed that the increased claims were a result of the vehicle operating in testing mode too long, rather than switching to "road mode."

97.   VWGOA employee James Liang ("Liang"), who served as Volkswagen's "Leader of Diesel Competence" from 2008 through 2015, and who previously was employed by VWAG and helped design the EA189 Engine, worked with certain co-conspirators to enhance the Cheat Device to allow the vehicle to more easily recognize when the vehicle was no longer in testing mode.   VWGOA falsely and fraudulently told U.S. customers, including Plaintiff, that a software update (the "Fraudulent Flash") announced by VWGOA in or about 2014 was intended to improve the vehicles when, in fact, Liang and his co-conspirators knew that part of the update was intended to improve the Cheat Device's precision to reduce stress on the emissions control system.

98.   Top executives from VWAG were also personally involved in the concealment, or otherwise maintained knowledge of the Cheat Device and failed to disclose it.   For example, VWAG executive Bernard Gottweis wrote a report to then-CEO of VWAG Martin Winterkorn in May 2014 regarding a study published by ICCT/WVU (the ICCT/WVU Study") that first detected large discrepancies between Volkswagen TDI diesel emissions when tested in a lab, where legally compliant emissions were produced, versus on the road, where emissions far exceeded the legal limits by many multiples. Gottweis specifically advised Winterkorn, "A thorough explanation for the dramatic increase in NOx emissions cannot be given to the authorities. It can be assumed that the authorities will then investigate the VW systems to determine whether Volkswagen implemented a test detection system in the engine control unit software (so-called defeat

device) and, in the event a 'treadmill' test is detected, a regeneration or dosing strategy is implemented that differs from real driving conditions."

99.     The Cheat Device finds its origins at Audi AG.  Engineers at Audi AG had developed a new technology for its 3.0-liter V6 diesel engine for the European market called "Pilot Injection" that could eliminate the traditional, disagreeable clattering noise of diesel engines at start-up through the injection of additional fuel into the engine on ignition.  But activation of Pilot Injection upon ignition caused the engine to exceed European emissions standards during emissions testing.  Audi solved this problem by implementing software that allowed the engine to recognize the European emissions test cycle and deactivate Pilot Injection accordingly.  Audi developed and deployed this cycle-beating software on its European-market Audi 3.0-liter V6 diesels from 2004-2008.  Because of its noise-reducing properties, Audi dubbed this device the "Acoustic Function."  Audi shared this technology and assisted Volkswagen in adapting it to its vehicles, and Audi-branded vehicles, for sale in the U.S. market.

### Volkswagen Profited Greatly by Cheating

100.    Volkswagen's massive advertising campaign for the Fraudulent Vehicles proved highly successful, as Volkswagen took a commanding lead in U.S. diesel vehicle sales.  Volkswagen's diesel vehicles were profiled on environmental websites and blogs as the responsible choice, relying on Volkswagen's representations of high mileage and low emissions.

101.    The success of Volkswagen's advertising campaign resulted in skyrocketing sales.  In 2007, Volkswagen sold 230,572 cars in the United States—a far cry from then-CEO Winterkorn's goal of 800,000 sales in 2018—and a negligible number of those were diesel

vehicles.  In fact, in 2007 only approximately 16,700 light-duty diesel vehicles were sold in the United States.  As Volkswagen released its "clean" diesel lineup and fraudulent advertising campaign, sales of the Fraudulent Vehicles grew dramatically, from 43,869 in 2009 to a peak of 111,285 in 2013.  This largely accounted for Volkswagen's sales growth in the United States to over 400,000 vehicle sales in 2013, nearly double the sales in 2007.  Likewise, the Fraudulent Vehicles contributed significantly to Audi's growth from 93,506 sales in 2007 to 182,011 in 2014.  According to the U.S. government, approximately 80,000 of the illegal vehicles sold by Volkswagen, Audi and Porsche in the United States had 3.0-liter TDI diesel engines.

102.    Volkswagen reaped considerable benefit from the Deceptive Emissions Scheme, charging premiums of thousands of dollars for the "clean" models of the Fraudulent Vehicles.

103.    There are other benefits Volkswagen received from its fraud that are less obvious, but nevertheless significant, which Volkswagen continues to benefit from to this very day. (e.g. greater TDI sales, because of lower $CO_2$, allowed credits for greater sales of gasoline cars at higher $CO_2$ levels; allowed economies of scale to build and operate Chattanooga plant, and expand other plants and dealer connections worldwide; tax credits; participation in government subsidized loans/capital expenditure programs, etc.)

104.    Volkswagen specifically undertook a cost-benefit analysis, prior to deciding to create market, and sell the Fraudulent Vehicles, and prior to fraudulently concealing the Cheat Device, and in deciding to continue to fraudulently conceal the Cheat Device.  Volkswagen determined that it would be in its profit interest, long term, to proceed with its fraud, even if it were to later get caught.

**Volkswagen Admits to Committing Felonies**

105.   On January 11, 2017, VWAG entered into a plea agreement ("VWAG Plea Agreement") with the United States relating to the Deceptive Emissions Scheme, in which VWAG agreed to plead guilty to several felonies including conspiracy, obstruction of justice, and entry of goods by false statement.

106.   The VWAG Plea Agreement contains Exhibit 2, Statement of Facts, which details the facts that support VWAG's guilty plea.

107.   The United States District Court for the Eastern District of Michigan found VWAG guilty pursuant to the VWAG Plea Agreement on March 10, 2017, at which hearing VWAG general counsel Manfred Doess stated, under oath, "Your honor, VWAG is pleading guilty to all three counts because it is guilty on all three counts."

108.   The facts set forth in Exhibit 2 of the VWAG Plea Agreement are true.

109.   The Defendants will not contradict any fact set forth in Exhibit 2 of the VWAG Plea Agreement.

110.   On August 31, 2016, VWGOA employee James Liang ("Liang"), who served as VWGOA's "Leader of Diesel Competence" during the time of the Deceptive Emissions Scheme, entered into a plea agreement (the "Liang Plea Agreement") with the United States in which Liang agreed to plead guilty to conspiracy relating to the Deceptive Emissions Scheme.

111.   The Liang Plea Agreement contains Section C, which details facts that support Liang's guilty plea.

112.   The United States District Court for the Eastern District of Michigan accepted Liang's Plea Agreement finding him guilty of conspiracy on September 9, 2016.  During that hearing,

Liang confirmed under oath that the facts set forth in Section C of the Liang Plea Agreement are true.

113. The facts set forth in Section C of the Liang Plea Agreement are true.

114. The Defendants maintain no evidence to refute the facts confirmed under oath by Liang and set forth in the Liang Plea Agreement.

115. On July 24, 2017, Oliver Schmidt, who served as the General Manager in charge of the Environmental and Engineering Office for VWGOA from 2012 through February 2015, entered into a plea agreement (the "Schmidt Plea Agreement") with the United States in which Schmidt agreed to plead guilty to conspiracy relating to the Deceptive Emissions Scheme.

116. Schmidt continued to serve as a manager for VWAG after February 2015 and committed acts in the United States in furtherance of the Deceptive Emissions Scheme during that time.

117. The Schmidt Plea Agreement contains a Section C, which details facts that support Schmidt's guilty plea.

118. The United States District Court for the Eastern District of Michigan accepted Schmidt's Plea Agreement and found Schmidt guilty of conspiracy on August 4, 2017.  During that hearing, Schmidt admitted under oath that the facts in the Schmidt Plea Agreement are true.

119. The facts set forth in Section C of the Schmidt Plea Agreement are true.

120. The Defendants maintain no evidence to refute the facts set forth in the Schmidt Plea Agreement.

121. Audi executive Zaccheo Giovanni Pamio, head of thermodynamics in Audi's engine development department, was arrested and charged with similar crimes on July 7, 2017.

An affidavit filed by Special Agent Lynn Rademacher-Gault in the United States District Court for the Eastern District of Michigan, Case No. 2:17-mj-30330, details the involvement of Panio and Audi in the Diesel Fraud.

122. The facts set forth in the affidavit of Special Agent Rademacher-Gault are true.

123. The Defendants lack any evidence to refute the facts set forth in the affidavit of Special Agent Rademacher-Gault.

### Volkswagen's Liability for the Acts of its Employees

124. Liang committed the acts set forth in the Liang Plea Agreement during the course and scope of his employment with VWGOA as its "Leader of Diesel Competence."

125. As the Leader of Diesel Competence for Volkswagen, Liang maintained authority to make decisions regarding the engineering and/or build and/or design and/or resulting emissions output of the engines contained in the 2.0 Liter Affected Vehicles and/or the 3.0 Liter Affected Vehicles.

126. As the Leader of Diesel Competence for Volkswagen, Liang was authorized by Volkswagen and Audi to act on its behalf in communications with regulators and others relating to the Fraudulent Vehicles, as more particularly set forth in the Liang Plea Agreement.

127. Liang maintained a sufficiently high position within VWGOA such that his acts in perpetrating the Deceptive Emissions Scheme are deemed to be the corporate acts of VWGOA, Volkswagen and/or the Joint Venture for purposes of punitive damages. Specifically, Liang's job description indicates that it was his job to manage "all technical issues related to the Clean Diesel projects" and his responsibilities included the following:

> [T]est and management drives, fleet testing, vehicle launch and Aftersales activities. This position interacts with the VW and Audi Brands and holds

direct contact to the individual Development Departments in Germany.
Duties include the following: - Prepare Clean Diesel launches in the U.S.
and Canada under the Engineering aspect - Prepare, coordinate and analyze
test drives in the U.S. and Canada - Prepare and coordinate management
drives in the U.S. and Canada - Interact with the VW and Audi Brands in
the U.S, Canada and Germany - Interact with VW and Audi Service and
Quality departments in the U.S., Canada and Germany - Assist EEO with
public presentations and ride and drive events - Lead workshops for the
successful Clean Diesel launches - Determine and report significant target
conflicts - Develop and prepare project reports to the Heads of Powertrain
Development in Germany - Ensure that Clean Diesel projects obtain market
introduction in time and accordance with project plans.

128.    Liang maintained little to no supervisory oversight by any manager or executive at
VWGOA or Audi.  While Liang maintained an office at VWGOA's emissions testing
facility in Oxnard, California, the manager within that facility – Mathias Barke – testified
that Liang did not have a supervisor while at that facility from 2012 through 2015.

129.    Stuart Johnson, head of the EEO department for VWGOA, which oversees all emissions-
related work by Volkswagen in the U.S., testified that he wasn't Liang's boss; he wasn't
sure if Liang had a boss, and wasn't even sure what Liang did for VWGOA, or whether he
worked for VWGOA or VWAG.

130.    Ricardo Vasquez, in charge of VWGOA's emissions' lab in Oxnard, California and who
maintained an office directly across the hall from Liang for almost four years, testified that
he was unaware that Liang had any supervisor at VWGOA, and never saw Liang taking
orders from anyone.  He further testified that although both he and his boss, Mathias Barke,
were required to get multiple permissions to make most larger expenditures, he was not
aware of Liang having to ever get consent from anyone at VWGOA for any expenditures
Liang initiated on his own, including emissions testing that Liang ordered from VWGOA
at the Oxnard Lab.

131.   Vasquez testified that he considered Liang to be his "customer" for whom Vasquez would perform emissions testing as ordered and in accordance with Liang's instructions. Vasquez testified that VWGOA charged for emissions' tests ordered by Liang, which were always paid by VWAG.

132.   Liang also oversaw certain fraudulent "scientific" research for Volkswagen at Lovelace Respiratory Research Institute ("LRRI"), which sought to generate "evidence" that diesel exhaust from "new technology" contained in the Fraudulent Vehicles did not harm human health. VWAG funded the LRRI Study through a non-profit entity it helped create known as EUGT. Liang ensured that the LRRI Study used emissions generated from one of the Fraudulent Vehicles (a 2013 Beetle TDI supplied by VWGOA) tested on a dyno (selected by VWGOA executive Stuart Johnson) while the Cheat Device was activated, thereby ensuring that the LRRI Study was based on fraudulent lab emissions, rather than real-world emissions. Volkswagen gave Liang complete authority to oversee all technical aspects of the LRRI Study. Liang monitored the LRRI testing, which was conducted in New Mexico, in real time from VWGOA's Oxnard facility in California.

133.   Although VWGOA has claimed that Liang was merely a "foreign service employee" of VWAG in an attempt to downplay the importance of Liang's role at VWGOA, such "foreign service employees" are typically sent from VWAG to VWGOA for only a three-year term. In Liang's case, his term was almost triple the standard term, given his centrality and importance to the ongoing perpetration of Volkswagen's Diesel Fraud in the U.S.

134.   Similar to Liang, Oliver Schmidt maintained a sufficiently high position within VWGOA from 2012 through February 2015, as head of VWGOA's EEO department, such that his

acts in concealing the Deceptive Emissions Scheme are deemed to be the corporate acts of VWGOA and/or of the Joint Venture for purposes of punitive damages.

135.   Schmidt also maintained a sufficiently high position within VWAG after 2015 such that his acts in concealing the Fraudulent Emissions Scheme, as more particularly set forth in the Schmidt Plea Agreement, are deemed to be the corporate acts of VWAG and/or of the Joint Venture for purposes of punitive damages.

136.   Stuart Johnson maintained a sufficiently high position within VWGOA, from May 2015 through the present, as head of VWGOA's EEO department, such that his misconduct is deemed to be the corporate acts of VWGOA and/or of the Joint Venture for purposes of punitive damages. Specifically, Johnson stayed silent while listening to Schmidt lie to Alberto Ayala of CARB during a meeting on August 5, 2015, when Schmidt (at the direction of Winterkorn) made only a partial admission relating to the Cheat Device. Johnson admitted in a recent deposition that knew that the cheating went well beyond what Schmidt admitted to Ayala at the August 5, 2015 meeting, but he chose not to disclose anything further about what he knew at that time.   Further, Johnson admitted failing to take any action to stop the sale of the Fraudulent Vehicles once he learned of the Deceptive Emissions Scheme on July 8, 2015.

137.   Other VWAG employees maintained sufficient high positions within VWAG that their acts, as more particularly detailed in the VWAG Plea Agreement, are deemed to be the corporate acts of VWAG and/or of the Joint Venture for purposes of punitive damages, including the following:  (a) Heinz-Jakob Neusser, supervisor in charge of Volkswagen Engine Development from October 2011 until in or about July 2013; (b) Rudolf Krebs, a supervisor in charge of Volkswagen Engine Development from in or about May 2005 to in

or about April 2007; (c) Jens Hadler, a supervisor in charge of Volkswagen Engine Development from in or about May 2007 to in or about March 2011; (d) Friedrich Eichler, a supervisor in charge of Volkswagen Engine Development from October 2013 to the present; (e) Bernd Gottweis, a supervisor with responsibility for VWAG's Quality Management and Product Safety department from in or about 2007 to in or about October 2014; (f) Richard Dorenkamp, who was a supervisor within Volkswagen Engine Development department from in or about 2003 until in or about December 2012; and (g) Cornelius Renken, who was a German-qualified in-house attorney for VWAG who was the in-house attorney principally responsible for providing legal advice in connection with VWAG's response to U.S. emissions issues from in or about May 2015 to in or about September 2015.

138. At the time that Liang was a VWAG employee and assisted in development of the Cheat Device, his boss was VWAG supervisor Thorsten Duesterdick, who claimed that he was forced to install the Cheat Device by his boss, VWAG manager Richard Dorenkamp. According to Duesterdick, Dorenkamp threatened him that his career would be over if he failed to comply.

139. Martin Winterkorn, who served as CEO of VWAG from January 1, 2007 through September 23, 2015, was informed of the Cheat Device in detail by no later than July 27, 2015, by both Jorn Kahrstedt, head of Engine Development for Volkswagen, and by Duesterdick, who was also present at the meeting. In gauging the reaction of the VWAG CEO to this news of cheating, Duesterdick stated, "I did not get the feeling that this was the first time that Winterkorn heard of it."

140. Kahrstedt, who was present for the July 27, 2015 meeting with Winterkorn, stated that Winterkorn did not order anybody to admit to the existence of the Cheat Device, and

according to Kahrstedt, only Winterkorn could make this decision. Instead, Winterkorn authorized Volkswagen to only "partially" disclose the problem in pending discussions with U.S. regulators.

141. Schmidt, who is currently in federal prison in Michigan for his role in the Diesel Fraud, purportedly even tried to obtain approval to issue a joint press release with CARB to advise the public of the Diesel Fraud, but his request was rejected by Volkswagen's PR Department, following the instructions from top management that the Diesel Fraud was to remain hidden for as long as possible.

142. According to Kahrstedt "Everyone involved in the [ICCT/WVU] study at VW knew about the deception."

143. Audi executives directly involved with knowledge of the Cheat Device, or otherwise taking an active role in developing it or to conceal it, include Giovanni Pamio (General Manager of V6 Diesel Engines), Henning Loerch (Director of Diesel Exhaust Gas Aftertreatment for V6 Engines) and Martin Gruber (Director of Audi Diesel Engine Thermodynamics Department).

**Volkswagen Ratified the Diesel Fraud**

144. On or about March 31, 2014, Volkswagen was alerted to a report by West Virginia University (the "ICCT/WVU Study") that on-road testing ("On-Road Testing") of its TDI vehicles showed NOx output in a range of 5-35 times higher than Volkswagen had represented to the public. Rather than immediately stopping all sales of Clean Diesel vehicles, Volkswagen continued to allow such vehicles to be sold to the public.

145. Schmidt, while serving as the General Manager of VWGOA's emissions department, knew of the Cheat Device and its concealment by both VWGOA and VWAG. Specifically, after

being notified of the ICCT/WVU Study, Schmidt wrote an e-mail to VWGOA employee Marcel Zirwes on April 2, 2014 and stated, "It should first be decided if we are honest. If we are not honest, everything stays as it is. ICCT has stupidly just published measurements of NAR diesels off-cycle, not good."

146.    On or about April 29, 2014, Schmidt received a report (the "EADA Report") from Dirk Waldecker ("Waldecker") in the Drivetrain Development Department ("EADA") of VWAG, which made three suggestions as to how to deal with the ICCT Study.  First, Volkswagen might "[a]cknowledg[e] results without comment or ignoring them," but Waldecker warned that this could lead to "further measurements/testing whether defeat device is present, in worst case, buyback of vehicles."

147.    Second, Volkswagen might "[c]omment[] on the questions without acknowledging the problem." If this option were chosen, Waldecker set out a series of hypothetical questions U.S. regulators might ask with proposed falsified answers of a technical nature to attempt to ensure that regulators would not discover the true source of the "problem" which was the Cheat Device.

148.    Third, Waldecker suggested Volkswagen might, "Offer a software update," but warned, "By modifying applications, it is possible to reduce RDE NOx emissions in GEN I and GEN II [vehicles], but not to comply with the limits."

149.    Schmidt received the EADA Report, then forwarded it as an attachment to an e-mail that he wrote to VWGOA's then-CEO Michael Horn on May 15, 2014, on which David Geanacopolis, VWGOA's then top in-house lawyer, was copied.  In his e-mail, Schmidt advises Horn that the Environmental Protection Agency ("EPA") and the California Air Resources Board ("CARB") have begun investigating Volkswagen, given the results of the

ICCT/WVU Study; that EPA and CARB could perform "defeat device testing;" and that Volkswagen could be subjected to maximum fines of the $37,500 (to the EPA for violations of federal Clean Air Act) per vehicle and $5,500 (to CARB for violations of California law) per vehicle.

150.    In his May 15, 2014 e-mail to Horn, Schmidt affixed a second attachment dated May 13, 2014, in which Schmidt stated, in pertinent part, "Difference between road / dynamometer must be explained. (intent=penalty!)"

151.    Horn later admitted to Stuart Johnson, who by that time had assumed Schmidt's position as head of VWGOA's EEO, that Horn had received Schmidt's e-mail on May 15, 2014, which the attachments, had read those documents, and understood in May 2014 that cheating was a possible explanation for the ICCT/WVU Study.

152.    Also in May 2014, Schmidt told Mark Gillies, VWGOA's senior manager for product and technology communications (the "PR Department"), that cheating by Volkswagen was a possible explanation for the results of the ICCT/WVU Study.

153.    Gillies, in turn, reported Schmidt's statement about cheating to his superior, VWGOA executive vice president Scott Vazin in May 2014, and to VWGOA executive vice president Mario Guerreiro in December 2014.

154.    Vazin responded by telling Gillies he would discuss Schmidt's statement about cheating with the other VWGOA executive vice presidents and with VWGOA's then-CEO, Michael Horn.  Gillies stated that he knew that if Volkswagen was cheating on emissions, there would be serious ramifications, and admitted, "That is precisely why I went to both my bosses and told them about it."

155.    In December 2014, in his conversation with VWGOA executive vice president Guerreiro, Gillies predicted the ICCT/WVU Study would result in Volkswagen being found to have violated the Clean Air Act for emissions' cheating.

156.    On July 8, 2015, VWGOA executive Johnson, head of the EEO at VWGOA, attended a meeting with CARB after which Johnson concluded that he was "90% sure we [Volkswagen] were cheating."

157.    On July 29, 2015, Johnson spoke to then-CEO Horn by phone and stated, "Mr. Horn, it looks like we've been cheating and we've been caught."

158.    During this entire time, from March 31, 2014 through September 18, 2015, Volkswagen and Audi continued to sell the Fraudulent Vehicles.  Even after CEO Horn was directly advised of the cheating on July 29, 2015 by Johnson, he did not issue a stop-sale order, but instead, VWGOA and VWAG and Audi continued to sell the Fraudulent Vehicles.

159.    The 2.0 Liter Affected Vehicles continued to be sold until at least September 18, 2015, when the EPA issued its Notice of Violation, and forbid Volkswagen and Audi to further sell any 2.0 Liter Affected Vehicles.

160.    The 3.0 Liter Affected Vehicles continued to be sold until at least November 2, 2015, when the EPA issued a second Notice of Violation, and forbid Volkswagen and Audi to further sell any 3.0 Liter Affected Vehicles.

161.    Continuing to sell and profit from the Fraudulent Vehicles after the CEO of both VWGOA and VWAG maintained knowledge of the cheating constitutes ratification by VWGOA and VWAG of the conduct of Liang and his co-conspirators who engaged in the Fraudulent Emissions Scheme.

162.    Ratification further occurred when, after discovering Liang's involvement, VWGOA paid for Liang's criminal attorney fees.

163.    Audi executives also maintained knowledge of the cheating and, rather than stopping it, encouraged it to continue.  For example, Audi executive Ulrich Weib, recently revealed a document signed by Audi's head of powertrain development Dr. Thomas Heiduk, which documented that Audi board members Rupert Stadler (CEO), Ulrich Hackeberg (R&D), Werner Zimmerman (Quality Control) and Michael Neumayer (Product Management) each had knowledge of the Cheat Device and directed Weib to continue to use it as late as July 2015.

### Civil Conspiracy

164.    The Defendants are also equally liable for the acts described herein because they engaged in a civil conspiracy in furthering the Diesel Fraud.  VWAG and Audi AG and VWGOA, by and through their respective agents set forth herein, each agreement to conspire to further the Diesel Fraud set forth herein.  Each of these Defendants, as more particularly described herein, committed acts in furtherance of the conspiracy (e.g. Audi AG developing the Cheat Device; VWAG perfecting and implementing the Cheat Device into all Volkswagen-branded and Audi-branded vehicles; VWGOA falsely certifying the Fraudulent Vehicles for sale and taking other affirmative acts to conceal the Cheat Device; all defendants collectively acting to falsely market the Fraudulent Vehicles).  As a direct and proximate result of such civil conspiracy, the Plaintiff was damaged by purchasing the Vehicle that Plaintiff would not have otherwise purchased in the absence of such conspiracy, by otherwise overpaying for the Vehicle, and in incurring those other damages set forth herein.

**Volkswagen Admitted Liability**

165.   Volkswagen has admitted marketing, advertising, selling, and/or leasing the Fraudulent

Vehicles equipped with Cheat Device and concealing its existence and therefore allowing

the Fraudulent Vehicles to be sold in the United States despite emitting high levels of

noxious gasses during regular on-road use.

166.   At a September 2015 event to promote the 2016 Passat, Michael Horn, then-President and

CEO of VWGOA, referring to the Diesel Emissions Scandal, admitted, "Let's be clear

about this. Our company was dishonest . . . with all of you, and in my German words, we

have totally screwed up."

167.   Michael Horn's statement that Volkswagen was "dishonest" with its customers is true.

168.   On September 27, 2015, Volkswagen posted a video from then-President and CEO of

VWGOA Michael Horn to a website it established to address the scandal known as

http://www.vwdieselinfo.com.   In that video, Mr. Horn apologizes for Volkswagen's

misconduct, and stated, in pertinent part, as follows:

> While we are still gathering all the facts, it is clear that our company
> betrayed the trust of you, our customers, our employees, our leaders,
> and the public.  The findings of this investigation do not reflect our
> values and who we are as a company and we are devoted to setting
> this right.

169.   Michael Horn's statement that Volkswagen "betrayed the trust" of its customers is true.

170.   On or about September 29, 2015, Mr. Horn personally wrote to owners of the 2.0 Liter

Affected Vehicles, offering a "personal and profound apology".  Mr. Horn admits in the

letter that "Volkswagen has violated your trust" and stated:

> I would like you to know that we take full responsibility and are
> cooperating with all responsible agencies. I can also assure you that
> we are committed to making this right for you – and taking steps to
> prevent something like this from ever happening again.

171.    On October 8, 2015, Mr. Horn appeared before the United States' House of Representatives, Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce (the "Congressional Subcommittee Hearing") and testified under oath stating, in part, "On behalf of our company and my colleagues in Germany and me personally, I would like to offer a sincere apology sincere apology for Volkswagen's use of a software program that served to defeat the regular emissions testing regime."

172.    Michael Horn's statement that Volkswagen used "a software program that served to defeat the regular emissions testing regime" is true.

173.    During the Congressional Subcommittee Hearing, Mr. Horn further admitted, "[T]hat emission software in four-cylinder diesel vehicles for model years 2009 until 2015 contained . . . hidden software that could recognize whether a vehicle was being operated in a test laboratory or on the road. The software made those vehicles emit high levels of nitrogen oxides when the vehicles were driven in actual road use rather than laboratory testing."

174.    Michael Horn's statement quoted in the foregoing paragraph is true.

175.    And when asked during this same hearing, "To the best of your knowledge, did VW install this software for the express purpose of defeating emissions controls?" Mr. Horn replied, "To our understanding—and this is also part of the investigation—it was installed to this purpose, yes, for this purpose."

176.    Michael Horn's statement quoted in the foregoing paragraph is true.

177.    In this same hearing, Congressman Barton stated to Mr. Horn, "[W]hen we have had problems with manufacturers, automobile manufacturers, in every case it has been something happened that was really a mistake, an accident, that they just didn't foresee it.

That is not the case here."  Mr. Horn responded, "Yes."  Congressman Barton then stated, "There was a knowingly and willful decision to deceive in one of the most important markets in the world, and that, sir, is just wrong."  Mr. Horn admitted, "We agree."

178.   Michael Horn's admission to Congressman Barton that Volkswagen engaged in a "knowingly and willful decision to deceive" is true.

179.   Notwithstanding Volkswagen's admissions concerning the Cheat Device installed in the 2.0 Liter Affected Vehicles, during the time period from September 18, 2015 until November 2, 2015, on at least one or more occasions, Defendant publicly denied the existence of any Cheat Device in the 3.0 Liter Affected Vehicles.

180.   Volkswagen's denial referred to in the foregoing paragraph was made after the time when Volkswagen was already preparing to disclose the existence of Cheat Device in the 3.0 Liter Affected Vehicles.

### Impact of Defendants' Actions on Plaintiffs

181.   On June 28, 2016, Volkswagen announced that it had reached a partial settlement (the "Partial Settlement") with 44 States regarding some of the claims asserted in the MDL, and as a part of that Partial Settlement, Volkswagen admitted to the Diesel Fraud.  Volkswagen entered into a Partial Consent Decree, approved by the Court in the Partial Settlement, in which Volkswagen conceded the following:

Settling Defendants [VWAG and VWGOA] admit that software in the 2.0 Liter Subject Vehicles enables the vehicles' ECMs to detect when the vehicles are being driven on the road, rather than undergoing Federal Test Procedures, and that this software **renders certain emission control systems in the vehicles inoperative** when the ECM detects the vehicles are not undergoing Federal Test Procedures, resulting in emissions that exceed EPA-compliant and CARB-compliant levels when the vehicles are driven on the road. (Emphasis added).

182.    Similarly, software in the 3.0 Liter Subject Vehicles enables the vehicles' ECMs to detect when the vehicles are being driven on the road, rather than undergoing Federal Test Procedures, and that software renders certain emission control systems in the vehicles inoperative when the ECM detects the vehicles are not undergoing Federal Test Procedures, resulting in emissions that exceed EPA-compliant and CARB-compliant levels when the vehicles are driven on the road.

183.    The inoperative condition of the emissions control systems in the Fraudulent Vehicles, including the vehicles owned by Plaintiffs, violates applicable state law in those jurisdictions where such vehicles were purchased and where such vehicles are currently maintained.

184.    Given that the vehicles sold to Plaintiffs by Defendants was not what was promised, Plaintiffs are entitled to economic damages, incidental and consequential damages as may be proven, plus prejudgment interest, costs, expert witness fees and attorneys' fees.

185.    To the extent that the Court were to allow evidence of any potential "fix" for the vehicle, or if the Plaintiff were determined to be required to fix the vehicle for any reason, then Plaintiffs damages would further include the cost of repair, insofar as the Plaintiff does not trust Volkswagen to do any such work to the vehicle.

186.    The excess NOx emissions resulting from Defendants' Diesel Fraud constitutes a health hazard to the Plaintiff, Plaintiff's family, and to the greater community at large. Many of the well-documented adverse health effects from NOx exposure have a delayed onset, sometimes many years in the future, and is cause for legitimate and ongoing concern for Plaintiff, who cannot know for sure to what degree Plaintiff's health has been impacted by Volkswagen's Diesel Fraud until many years from now. Even if ultimately there proves to

be no actual physical harm to Plaintiff's health from the Defendants' Diesel Fraud, the risk of such harm in-and-of itself – potentially requiring the expense of medical monitoring – and the mental distress to Plaintiff caused by such risk, constitutes damage for which the Plaintiff is entitled to be compensated.

187.   Furthermore, Volkswagen knew of the adverse health impacts to the public that would be caused by its fraud, which goes to the reprehensibility of its misconduct, and therefore, is relevant to the issue of what amount of punitive damages should be awarded against Volkswagen in this case.

188.    NOx above-and-beyond the applicable legal limit caused by the Fraudulent Vehicles results in toxic air pollution that causes death and disability. Upon information and belief an increased number of people will experience the onset of bronchitis, pneumonia, asthma and cardiovascular disease resulting from the at-issue increase in pollutants from the Fraudulent Vehicles.  Sudden death from cardiovascular instability is one consequence of extra exposure to PM2.5 that arises from nitrogen oxides. And while most of the research studies NOX and PM2.5, Volkswagen's fraud also led to an increased release of toxic pollutants that included ozone, soot, carbon monoxide, sulfur dioxide, aldehyde's, benzene, polycyclic aromatic hydrocarbons, nitrated PAHs, sulfuric acid, and trace metals (including cadmium and arsenic).

189.   Persons most vulnerable to being adversely impacted from exposure to NOx are those with pre-existing health problems, or those who have been exposed to particularly large quantities of NOx, such as a person who starts their vehicle inside their garage, even with the garage door open, to allow the vehicle to warm-up before driving it.  One or more of the Plaintiffs at-issue in this case started their respective Fraudulent Vehicle in this manner.

190.    In 1996 the Harvard School of public health described a significant increase in cardiovascular deaths, asthma, bronchitis, and pneumonia, with a greater impact on the elderly and children as a result of PM2.5 exposure. The increased adverse health effects occurred with one to a few days after increased exposure to PM2.5 and nitrogen oxides.

191.    Young people have an increased risk of heart attacks when exposed to diesel exhaust particles and gases. The age group 25 to 29 have an increase in heart attacks over 2 ½ times. Each increment of 5 ug/m3 of PM2.5 doubles the risk of pneumonia in children and asthmatic changes in the bronchial tubes is increased over 50% by PM and NO2. Exposure to the unborn baby to PM2.5 means that after they are born they will have significantly more respiratory illnesses.

192.    On June 12, 2012, the International Agency for Research on Cancer ("IARC"), a division of the World Health Organization ("WHO"), reclassified diesel exhaust from its group 2A of "probable carcinogens" to its group 1 substances that have "definite links to cancer." IARC stated upon releasing this report, "[D]iesel exhaust is a cause of lung cancer" and noted "a positive association with an increased risk of bladder cancer."  Volkswagen was aware of the IARC report and sought to find "studies that might contradict the WHO report" to "help us with counter messaging." These efforts culminated in the hiring of Lovelace Respiratory Research Institution ("LRRI") to conduct a fraudulent study (the "Study") to attempt to downplay the risk of harm from diesel exhaust (and to further conceal the Defendants' fraud) by purporting to compare old diesel technology used in the underlying studies that support the IARC report with so-called new diesel technology allegedly represented by Volkswagen's "Clean Diesel" line of vehicles. The contract for this Study was negotiated or otherwise reviewed/revised by VWGOA's general counsel

from Virginia. Stuart Johnson arranged for the purchase of the dynamometer to the used in the LRRI study from Michigan and traveled from Michigan to Ohio to pick up that dyno and transported it to LRRI in New Mexico. The testing of these potentially harmful gases was done on monkeys. According to the deposition of Dr. Jacob McDonald of LRRI taken on August 16,2017, who supervised the Study for LRRI, Volkswagen maintained an active role in the Study by providing one of its fraudulent "Clean Diesel" cars to be used in the Study; by selecting the dynamometer used in the Study (done by VWGOA executive Stuart Johnson); and by setting the parameters of dynamometer to ensure control over the emissions that would be produced and used in that Study (done by VWGOA employee James Liang ).

193.    Volkswagen knew of the health risks of producing vehicles with excessive NOx and other pollutants, yet with actual malice, or reckless disregard for the rights of its customers and the general public, it deliberately continued to market and sell the Fraudulent Vehicles knowing the health risks they imposed on the public, and then actively and fraudulent attempted to hide these risks by funding fake "scientific" research for its "counter messaging."

194.    According to the latest scientific research, many people will die or otherwise become gravely ill as a direct result of Volkswagen's fraud described herein, which Volkswagen knew would occur at the time it chose to engage in the at-issue conduct.  Because the onset of such serious disease can take decades to develop, and because the adverse impact from breathing diesel exhaust is often impossible to currently detect, Plaintiffs are left only to worry as to what impact Volkswagen's fraud has had on their person well-being, as well as the well-being of their family members.

195.   The Defendants' misconduct has also adversely affected Plaintiff's emotional well-being in other ways, and has otherwise caused Plaintiff mental distress, embarrassment, stress and inconvenience, insofar as Plaintiff has inadvertently been made an involuntary participant in Volkswagen's crime and the resulting harm to others and the environment. Plaintiff is entitled to compensation for these emotional injuries.

### Reliance by Plaintiff on Defendants' False Advertising

196.   The false representations by Volkswagen described in detail herein, or those substantially similar, were reviewed by Plaintiff just prior to purchasing the at-issue Vehicle and were relied upon by Plaintiff in making the purchase decision.  Without those representations, Plaintiff would not have purchased the Vehicle.

197.   Without limiting the foregoing, Plaintiff states that just prior to the time when Plaintiff purchased the Vehicle, Plaintiff reviewed and relied upon the official 2014 Touareg brochure (the "Official Vehicle Brochure"), including the quoted statements set forth later in this paragraph, in making Plaintiff's purchase decision. The Official Vehicle Brochure was originally published by the Defendants in 2013 for the at-issue Vehicle.  The Official Vehicle Brochure repeatedly describes the Vehicle as a "Clean Diesel" and states, "3.0L TDI Clean Diesel engine. Engineered with the idea that less is more. The Touareg TDI has lower $CO_2$ emissions compared to 88% of other vehicles.* So every getaway you make will be a clean one."  The Official Vehicle Brochure further suggests that the Vehicle is environmentally friendly stating, "Think beyond green. Think Blue. . .  Building cards comes with responsibilities – not just to you, but to the environment."  Each of these statements was false or otherwise misleading at the time such statements were made.

**Tolling of the Statute of Limitations**

198. At some point in time after November 2, 2015, Plaintiffs first learned of the Diesel Fraud perpetrated by Volkswagen.  Plaintiffs could not have reasonably discovered the Diesel Fraud prior to November 2, 2015.

199. Defendants, by their fraudulent actions, inhibited the Plaintiffs' ability to bring a lawsuit against the Defendants prior to November 2, 2015, and therefore, any applicable statute of limitations were tolled until that date, or otherwise did not begin to run until that date. Alternatively, the Defendants are estopped from asserting any otherwise applicable statutes of limitation as a defense, given Volkswagen's misconduct.

200. Plaintiffs are entitled to equitable tolling of any and all applicable statutes of limitations in this cause pursuant to *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552-56 (1974), and its progeny.  This doctrine, and its progeny, tolls all otherwise applicable statutes of limitations from the date of the first-filed class action lawsuit relating to the 3.0 Liter Affected Vehicles, which on information and belief, occurred on November 24, 2015, in the case of *Dennis Burden, et als. v. Volkswagen Group of America, Inc., et als.*, Case#2:15-cv-09125 (the "Burden Class Action"), which was filed in the United States District Court for the Northern District of California.  The Burden Class Action was brought on behalf of a class of plaintiffs that included the Plaintiffs' herein and the Plaintiff's Vehicle (the "3.0 Liter Class").  The Burden Class Action was later merged with and became a part of a Consolidated Consumer Class Action Complaint also filed in the he United States District Court for the Northern District of California (the "MDL Court") in a matter known as *In re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, Case#3:15-md-02672 (Doc#1230) (the "Consolidated Class

Action").  The MDL Court conditionally certified the 3.0 Liter Class by Order entered in the Consolidated Class Action on February 16, 2017 (Doc#2919) as part of an approval of a preliminary settlement (the "Class Settlement").  Plaintiffs herein timely opted out of the Class Settlement on April 14, 2017, which was the deadline for submission of the permitted election to opt-out of the Class Settlement.  Therefore, any otherwise applicable statutes of limitations on any of Plaintiffs' claims were equitably tolled from November 24, 2015 when the Burden Class Action was filed until April 14, 2017 when Plaintiffs opted out of the Class Settlement. *See, e.g., Tosti v. City of Los Angeles*, 754 F.2d 1485 (9th Cir. 1985) (holding that in class cases where a class is certified, the statute of limitations remains equitably tolled under *American Pipe* until the date that plaintiff opts out of the class).

201.   Plaintiffs are further entitled to statutory tolling of any otherwise applicable statute of limitations, which tolling commenced on November 24, 2015 when the Burden Class Action was filed, *see* Michigan Court Rule 3.501(F)(1), and ended on April 14, 2017 when Plaintiffs opted out of the Class Settlement. *See* Michigan Court Rule 3.501(F)(2)(d).

## CLAIMS FOR RELIEF

### COUNT I
### Affirmative Fraud

202.   Plaintiff incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

203.   Plaintiffs bring this Count against all Defendants.

204.   Volkswagen made false representations of material fact to Plaintiff, as described previously with particularity herein, including the representation that the Fraudulent Vehicles, including the at-issue Vehicle, were "clean" "green" "environmentally friendly" and would avoid "90% of NOx emissions." Furthermore, Volkswagen falsely stated that the 3.0-liter

engine contained in at-issue Vehicle was "The Cleanest Diesel in the World," and that the at-issue Vehicle would produce lower levels of NOx than gasoline-powered vehicles and that the at-issue Vehicle would only emit "ultra-low levels of emissions."  The Defendants also specifically made the false statements in the Official Vehicle Brochure as previously quoted herein.

205.  Each of these misrepresentations referenced in the foregoing paragraph and otherwise set forth herein, at the time they were made, concerned either a past or then-existing material fact, and were made by Volkswagen with reasonable calculation and intent to deceive.

206.  Defendants knew or should have known that Plaintiff was relying on their representations, which Volkswagen knew were false and made with the intent to deceive Plaintiff concerning the quality, performance and environmental impact of the Vehicle.

207.  Volkswagen had knowledge of the falsity of the representations made to the consumers, including the Plaintiff, in or before 2009.  Even if the highest executives within Volkswagen did not have actual knowledge of the implementation of the Cheating Software at the time the scheme was put into place, they could have and should have discovered it before importing and selling the Vehicle and before misrepresenting the quality and characteristics of the Vehicle as "clean" and "environmentally friendly" and as otherwise complying with applicable law relating to emissions.

208.  The false representations made by Volkswagen as detailed herein were made to persuade Plaintiff, and other prospective customers like Plaintiff, to act by purchasing or leasing one of the Fraudulent Vehicles. Volkswagen's fraudulent actions were willful and done for its pecuniary benefit.

209.   Volkswagen's statements regarding the Vehicles' performance, characteristics, fitness, and legal compliance are expressly contained in documents prepared, issued and provided by Volkswagen such as the "window sticker", at-issue Vehicle brochures, the Official Vehicle Brochure, purchasing documents, and other documents and advertisements provided to or otherwise made available to Plaintiff.

210.   Plaintiff reasonably relied upon the misrepresentations detailed herein in purchasing the Vehicle (including those previously detailed herein, and without limiting the foregoing, also including the false representations that the Vehicle was "clean" "green" "environmentally friendly" had "low emissions" and was otherwise in compliance with applicable emissions laws and those statements specifically quoted herein and set forth in the Official Vehicle Brochure), having no way of knowing of the existence of Volkswagen's false statements, material omissions, or the existence of the Cheating Software.

211.   Plaintiff did not learn of the falsity of any of Volkswagen's statements or of the existence of the Cheating Software, until on or after September 18, 2015, as to those statements related to the 2.0 Liter Affected Vehicles, and not until on or after November 2, 2015, as to those statements related to the 3.0 Liter Affected Vehicles.

212.   As a direct and proximate result of the affirmative misrepresentations set forth herein, Plaintiff was damaged by purchasing a vehicle Plaintiff would not have bought had Plaintiff known the truth, by overpaying for the Vehicle and not receiving what Plaintiff was promised, and by other damages set forth herein or to otherwise be proven at trial, including economic damages, incidental/consequential damages, and damages relating to humiliation, embarrassment, mental anguish, and inconvenience, for which Plaintiff is

entitled to recover from Defendants jointly and severally. Alternatively, Plaintiff is entitled to recover from Defendants disgorgement of gross profits, without any corresponding deduction by Defendants for expenses in furthering its fraud. Plaintiffs are further entitled to recover pre-judgment interest, attorneys' fees and costs, expert witness fees, and such other sums as the jury may determine to be fair and just.

213. Since Defendants' misconduct and acts complained of herein were performed intentionally and maliciously, or in conscious and intentional disregard of and indifference to the rights and safety of others, which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm, the Plaintiff is entitled to recover of Defendants punitive damages.

214. Factors that the jury should consider in assessing punitive damages includes Volkswagen's financial condition and profit motive for its misconduct, its past record of multiple violations of a similar nature, the extent of the false advertising across multiple vehicle makes and models over many years, the hypocrisy of such advertising that touted the environmental friendliness of cars that Volkswagen specifically knew were environmentally harmful, the hypocrisy of advertisements suggesting the honesty of Volkswagen and Audi like the "Truth in Engineering" slogan and like the commercial suggesting the Defendant's engineers were "angels" and/or miracle workers, all the while Defendant knew it was engaged in a fraudulent scheme, the targeting by Volkswagen of environmentally conscious consumers in its marketing efforts, the harm caused by Volkswagen's conduct, including impacts on health, the profits made by Volkswagen from its misconduct, the multi-year and multi-person effort necessary to implement the Diesel Fraud, and efforts by Volkswagen over a number of years to hide its misconduct to avoid

getting caught, including the attempted and actual destruction of evidence, to name just a few.

## COUNT II
### Fraud by Concealment

215. Plaintiff incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

216. Plaintiffs bring this Count against all Defendants.

217. Defendants intentionally concealed and suppressed material facts concerning the build and quality of the Fraudulent Vehicles to mislead Plaintiff about the true nature of the Fraudulent Vehicles. Defendants accomplished their scheme, and the concealment thereof, by installing, aiding in the installation of, and/or failing to disclose the Cheat Device, which caused the vehicles to operate in a low-emission test mode only during testing, while during normal on-road use, the Fraudulent Vehicles emitted grossly larger quantities of noxious pollutants and contaminants than represented, in an amount up to 40 times above the applicable legal limit.

218. Defendants further concealed the Cheat Device by affirmatively touting the many environmentally friendly benefits of its "Clean Diesel" vehicles across multiple advertising mediums, including Volkswagen's and Audi's barrage of false press releases, false statements by corporate executives, false websites, misleadingly touting fraudulent environmental "awards" received, false television advertisements, false brochures (including those quoted herein set forth in the Official Vehicle Brochure), false postings on social media, false statements to third-party reviewers, false window stickers and fraudulent training of its sales force and subsequent false marketing by them of its TDI-line of vehicles as "clean" and "environmentally friendly" and otherwise compliant with

emissions standards, including those specific advertisements set forth herein or those substantially similar.   Collectively, Volkswagen's and Audi's extensive marketing campaign created in the mind of Plaintiff the reasonable belief that the Fraudulent Vehicles were particularly clean, environmentally friendly, and/or had low emissions compared to other vehicles and that such vehicles otherwise complied with applicable emissions laws.

219.   Although the Defendants did not directly sell the at-issue Vehicle to Plaintiff, the Defendants directly controlled the false representatives and affirmative omissions set forth herein insofar as it controlled the marketing activities and representations made by its dealer (and their salespeople), who sold the at-issue Vehicle to Plaintiff.  In the Defendants' marketing materials that the Defendants published, the Defendants specifically refer prospective customers to the Defendants' authorized dealers to obtain further information regarding the TDI "Clean Diesel" Vehicles, and therefore, the Plaintiff was entitled to rely upon statements of those salespeople as if the Defendants themselves were the ones making the at-issue representations and material omissions.

220.   The nature of Defendants advertising to position itself as a company that deeply cares about the environment and target marketing to further that reputation in the mind of environmentally conscious individuals, including the Plaintiff herein, instilled in Plaintiff a special trust in Volkswagen by Plaintiff, which it was intended to do, and such trust gave rise to a fiduciary relationship between Volkswagen and environmentally conscious consumers, including Plaintiff.  The fiduciary nature of this relationship is further shown in the fact that the "clean diesel" attribute of the Vehicle that purportedly complied with applicable emissions' requirements in all 50 states were claims that were impossible for the Plaintiff to test, and therefore, implicit required the Plaintiff to trust the Defendants.

221.    Volkswagen signed a Consent Decree in 2005 with the U.S. EPA in which Volkswagen promised full disclosure of any emissions defeats in regularly reporting to the EPA (which, in turn, would have been available to the public, including Plaintiff), which would have included the Cheat Device.  This Consent Decree was in effect when Volkswagen failed to disclose the at-issue Cheat Device to Plaintiff.  Moreover, independent of the Consent Decree, there was further a duty to disclose the Auxiliary Emissions Control Devices (which would include the at-issue Cheat Device) when making application for permission to sell such vehicles to the public, which disclosure obligation is for the protection of the health and safety of the public.

222.    In each instance of advertisement and marketing described herein, through all the foregoing mediums, Defendants maintained the chance to affirmatively disclose the Cheat Device. The Defendants maintained a duty to make such an affirmative disclosure, having made representations regarding the Fraudulent Vehicles' characteristics which were inconsistent with an undisclosed Cheat Device. To be sure, had the Defendants affirmatively disclosed the Cheat Device in any one of Volkswagen's or Audi's advertisements prior to the Plaintiff's purchase of Plaintiff's respective vehicle, such a revelation would have been widely made known throughout the media and otherwise (e.g. dealerships, third-party reviewers of Volkswagen products, regulatory action etc.), which would have alerted the Plaintiff to the Cheat Device and the Deceptive Emissions Scheme.  This would have, in turn, resulted in Plaintiff's avoidance of the purchase of a Fraudulent Vehicle, either because the Plaintiff would never have purchased a vehicle equipped with a Cheat Device or that otherwise emitted noxious emissions in excess of applicable legal limits, or the Fraudulent Vehicles would have no longer been available for purchase to Plaintiff, given

the likelihood that Volkswagen's and Audi's disclosure would have caused appropriate regulators to force Defendants to remove the Fraudulent Vehicles from the marketplace. Either way, had Volkswagen simply been honest, Plaintiff could have and would have avoided the purchase of a Fraudulent Vehicle and the resulting losses.

223.    Even in the absence of the broad, multi-year marketing campaign, Volkswagen and Audi would have still maintained a duty to disclose the Cheat Device because the simple act by Volkswagen of offering the Fraudulent Vehicles for sale communicated to Plaintiff and those similarly situated that such vehicles complied with applicable emissions laws. Having made that representation by its words and deeds, Volkswagen and Audi maintained a duty to disclose the Cheat Device to Plaintiff.

224.    In each instance when Volkswagen and Audi failed to make this required disclosure in its marketing of the Fraudulent Vehicles, the Defendants further violated its applicable duty of disclosure to Plaintiff and further perpetrated its fraud.  Put a different way, Volkswagen and Audi owed a duty to disclose the true facts regarding the Cheat Device, but intentionally failed to do so. Each advertisement in which that failure continued is further evidence of the Defendants' ongoing concealment.

225.    Rather than affirmatively disclosing the Cheat Device as Volkswagen and Audi had a duty to do, Defendants instead further affirmatively concealed the Cheat Device with the OBD Cheat, thereby inhibiting the normal diagnostic systems within the at-issue vehicles from alerting the Plaintiffs to the Defendants' deception, which perhaps state regulators or the Plaintiff may have discovered in the absence of the OBD Cheat.

226.    Defendants further concealed the Cheat Device with the Fraudulent Flash, which on information and belief, was surreptitiously installed by Defendants on Plaintiff's vehicle,

by and through the Defendants' dealer agents, in furtherance of Defendants' attempt to conceal its Fraudulent Emissions Scheme.

227.   Defendants' fraudulent concealment was reasonably calculated to deceive consumers, including Plaintiff, into believing that the Fraudulent Vehicles complied with applicable law on emissions, were properly certified, did not pose any hazard to Plaintiff's health, did not pose any hazard to the environment, and that the vehicles were otherwise clean and environmentally friendly.

228.   This intent to mislead by Volkswagen and Audi extended not only to purchasers of new motor vehicles, but also to purchasers of used Fraudulent Vehicles, even if such sales did not occur through an authorized Volkswagen dealer.  Volkswagen and Audi maintained the goal to conceal the Cheat Device from all purchasers because the discovery by one purchaser of the Deceptive Emissions Scheme would have inevitably led to the discovery by everyone of such scheme. Moreover, Volkswagen and Audi maintain a financial incentive to ensure that the price of used Fraudulent Vehicles stay highs because the higher the resale value of a used vehicle, the more Volkswagen can charge for that same vehicle when sold new.

229.   As VWAG, Liang and Schmidt have all admitted in their respective criminal plea agreements, and as former CEO Michael Horn admitted to Congress, the fraudulent concealment by Volkswagen of the Cheat Device described herein was perpetrated by the Defendants with the intention of deceiving consumers like Plaintiff.  To be sure, the purpose of Volkswagen's and Audi's fraudulent concealment as detailed herein was to persuade Plaintiff and others prospective customers like Plaintiff to act by purchasing or

leasing one of the Fraudulent Vehicles. In other words, Volkswagen's and Audi's fraudulent actions were premeditated, willful and done for their pecuniary benefit.

230.   Defendants knew or should have known that the Plaintiff was relying on the non-existence of Diesel Fraud and the Cheat Device when purchasing the Plaintiff's Vehicle, and that by fraudulently concealing information from Plaintiff concerning the quality, performance and environmental impact of the at-issue vehicle, Plaintiff was likely to be deceived and was likely to suffer damages resulting from that fraud.

231.   Plaintiff was, in fact, deceived by the Defendants' fraudulent concealment of the Diesel Fraud.  Plaintiff reasonably relied upon the non-existence of the Cheat Device, instead maintaining the good-faith belief that the vehicle purchased by Plaintiff was properly certified for sale, was compliant with applicable emissions laws, and was "clean" and "environmentally friendly."  Had the Plaintiff been aware of the Fraudulent Emissions Scheme, including the Cheat Device, the Plaintiff would not have purchased a Fraudulent Vehicle from Defendants.

232.   As a direct and proximate result of the affirmative misrepresentations set forth herein, Plaintiff was damaged by purchasing a vehicle Plaintiff would not have bought had Plaintiff known the truth, by overpaying for the Vehicle and not receiving what Plaintiff was promised, and by other damages set forth herein or to otherwise be proven at trial, including economic damages, incidental/consequential damages, and damages relating to humiliation, embarrassment, mental anguish, and inconvenience, for which Plaintiff is entitled to recover from Defendants jointly and severally.  Alternatively, Plaintiff is entitled to recover from Defendants disgorgement of gross profits, without any corresponding deduction by Defendants for expenses in furthering its fraud.  Plaintiffs are further entitled

to recover pre-judgment interest, attorneys' fees and costs, expert witness fees, and such other sums as the jury may determine to be fair and just.

233. Since Defendants' misconduct and acts complained of herein were done intentionally, with malice, or otherwise were willful and wanton, or because such acts were in conscious and intentional disregard of and indifference to the rights and safety of others, which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm, Plaintiff is entitled to recover from the Defendants punitive damages.

234. Factors that the jury should consider in assessing punitive damages includes Volkswagen's and Audi's financial condition and profit motive for its misconduct, its past record of multiple violations of a similar nature, the extent of the false advertising across multiple vehicle makes and models over many years, the hypocrisy of such advertising that touted the environmental friendliness of cars that Volkswagen specifically knew were environmentally harmful, the hypocrisy of advertisements suggesting the honesty of Volkswagen and suggesting its engineers were "angels" and/or miracle workers, all the while knowing Volkswagen was engaged in a fraudulent scheme, the targeting by Volkswagen of environmentally conscious consumers in its marketing efforts, the harm caused by Volkswagen's conduct, including impacts on health, the profits made by Volkswagen from its misconduct, the multi-year and multi-person effort necessary to implement the Diesel Fraud, and efforts by Volkswagen over a number of years to hide its misconduct to avoid getting caught, including the attempted and actual destruction of evidence, lack of true remorse, and the effort to hide the true health impacts caused by its fraudulent emissions, by virtue of the fake LRRI study, including the use of high-pressure

tactics to attempt to cause publication of the fraudulent LRRI study as recently as July 2017.

## COUNT III
### Negligent Misrepresentation

235. Plaintiff incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

236. Plaintiffs bring this Count against all Defendants.

237. Volkswagen owed Plaintiff, and other prospective purchasers of the Fraudulent Vehicles, a duty of due care to avoid making false statements regarding Volkswagen's products, and to affirmatively correct any material omissions that would otherwise leave its prospective or actual customers with a false impression regarding the characteristics of Volkswagen's products.

238. Volkswagen's multi-year advertising campaign as an environmentally responsible company that consumers could rely upon created in the mind of Plaintiff a trust and confidence in Volkswagen, as it was designed to do, that Volkswagen's alleged commitment to the environment, and its representations as to eco-friendly nature of the Vehicle, could be trusted and relied upon. Volkswagen also falsely advertised the Fraudulent Vehicles, including the at-issue Vehicle, as "clean" "green" "environmentally friendly" and as having "low emissions" and in making the specific statements set forth in the Official Vehicle Brochure previously quoted herein. These advertisements also failed to disclose the Cheat Device, the OBD Cheat or the Diesel Fraud.

239. These affirmative advertising representations and material omissions set forth herein, even if unintentional, constitute negligent misrepresentation because the Defendant knew, or through the exercise of reasonable care or investigation could or might have ascertained,

that their representations and material omissions were untrue or misleading. The advertisements were untrue or misleading because the emissions from the Fraudulent Vehicles were many multiples higher, sometimes as much as 40 times, then the applicable legal limit for NOx.

240. Volkswagen knew that its advertising was misleading because key employees within both VWGOA and VWAG and Audi AG (e.g. Schmidt, Liang, Juergen Peter, Heinz-Jakob Neusser, Rudolf Krebs, Jens Hadler, Friedrich Eichler, Bernd Gottweis, Zaccheo Giovanni Pamio) not only knew about the Diesel Fraud, the Cheat Device, the OBD Cheat, and the Fraudulent Flash, but they were directly involved in the intentional development and implementation of this diabolical plan. But even if the top executives at VWGOA and VWAG and Audi AG were not aware of the fraud from the beginning, Volkswagen certainly could have discovered it had they exercised reasonable care. Stated a different way, Volkswagen did not have reasonable grounds to believe that its misrepresentations were true because it could have and should have discovered the truth.

241. First, Volkswagen had obligated itself to implement and publicize within the company an ethics hotline and to train its employees to report any suspected unethical or illegal activity observed, which could even be done anonymously. Yet, most employees within the EEO department of VWGOA, which department falsely certified the Fraudulent Vehicles to regulators, were completely unaware of the ethics hotline and had received no training whatsoever from Volkswagen as to their obligation to report misconduct.

242. Second, on-road emissions' testing equipment ("PEMS") was commercially available to rent or buy during the 2009 – 2015 time-frame when Volkswagen was selling the Fraudulent Vehicles, yet VWGOA chose not to purchase or lease any PEMS unit to verify

the lab emissions of its dirty diesels in the U.S. (at least not until Volkswagen's excessive emissions were discovered by the ICCT/WVU Study). When Ricardo Vasquez, manager of Volkswagen's emissions lab in Oxnard, California, was asked why he did not take the initiative to investigate the possibility of emissions cheating or otherwise test for it, he responded bluntly that he was not going to waste his time doing testing that his lab wasn't going to get paid to do.

243. Third, Volkswagen was directly advised by the EPA and others at industry conferences that automobile manufacturers could manipulate two-wheel dynamometer results, *inter alia*, by programming the ECU to cause the emissions system to function differently in the lab than on the road. In an internal e-mail dated February 4, 2013, Stuart Johnson stated, "EPA believes there is some cheating going on where manufacturers have dynamometer calibrations if the vehicle recognizes it is on a chassis dynamometer. So, what is the solution? Test all vehicles on four-wheel dynos and that means that all-wheel drive cars must accept their penalty whatever it is, and two-wheel drive cars are tested where the non-driving axel is spinning and there's no need to deactivate any functions, such as traction control or ABS brakes." Despite this recognition by Johnson that use of a four-wheel dyno could significantly reduce or eliminate suspected emissions cheating, Johnson never recommended that VWGOA obtain or use 4-wheel dynos in its testing process, and Volkswagen never did.

244. Fourth, Volkswagen maintained service information for its TDIs showing that its diesel particulate filter ("DPF"), a central component in the emissions system, had a failure rate of 67% for 2009 and 86% for 2010 (a failure rate 4% or more is considered significant by

industry standards).  This was caused by the Cheat Device and should have led to its discovery.

245. Fifth, once the ICCT/WVU Study was made available to Volkswagen on March 31, 2014, a prudent company would have immediately stopped selling the Fraudulent Vehicles until the problem of such excessive emissions could be pinpointed and corrected.  VWGOA's current head of emissions compliance Stuart Johnson stated that his office lacked the proper expertise to properly investigate the ICCT/WVU Study, but that since the scandal became public, structural changes within VWGOA have been made "to give my office more expertise and more ability to interrogate the vehicles and investigate what the software is actually doing."  A prudent corporation would have had such safeguards in place years earlier, which might have prevented the fraud.

246. These misrepresentations and material omissions were made by Volkswagen with the intent that consumers like Plaintiff would act upon the misrepresentations and purchase one of the Fraudulent Vehicles, and/or would maintain ownership of the Vehicle (thereby limiting the market supply of such vehicles, increasing the resale value of those vehicles, and thereby increasing market demand/price for sales of new Clean Diesel TDI vehicles from Volkswagen that also contained Cheating Software) which would result in greater profit to Volkswagen, particularly given that its diesel vehicles were sold at a premium above its comparative gas models of the same cars.

247. Volkswagen's statements regarding the Fraudulent Vehicles' performance, characteristics, fitness, and material omissions, are expressly contained in documents prepared, issued and provided by Volkswagen such as the "window sticker", vehicle brochure, purchasing

documents, and other documents and advertisements provided to or otherwise made available to Plaintiff.

248. Plaintiff reasonably relied upon these misrepresentations that the Fraudulent Vehicles were "clean" "environmentally friendly" had "low emissions" and complied with applicable law (including those specific quotations set forth in the Official Vehicle Brochure previously detailed herein), in purchasing the at-issue Vehicle and in maintaining ownership of it, having no way of knowing of the existence of Volkswagen's false statements, material omissions, or the existence of the Cheat Device.

249. Plaintiff did not learn of the falsity of any of Volkswagen's statements or of the existence of the Cheat Device in Plaintiff's vehicle until sometime after November 2, 2015.

250. In short, even if Volkswagen's and Audi's false advertisements were not intentionally deceptive, at best the Defendants were grossly negligent in allowing such false statements and material omissions to be made, and to permit the Fraudulent Vehicles to be sold. It is also clear that the Defendants disseminated the misleading advertisements described herein with the intent and purpose, directly or indirectly, of selling the Fraudulent Vehicles.

251. As a direct and proximate result of the negligent misrepresentations set forth herein, Plaintiff was damaged by purchasing a vehicle Plaintiff would not have bought had Plaintiff known the truth, by overpaying for the Vehicle and not receiving what Plaintiff was promised, and by other damages set forth herein or to otherwise be proven at trial, including economic damages, incidental/consequential damages, and damages relating to humiliation, embarrassment, mental anguish, and inconvenience, for which Plaintiff is entitled to recover from Defendants jointly and severally. Alternatively, Plaintiff is entitled to recover from Defendants disgorgement of gross profits, without any corresponding

deduction by Defendants for expenses in furthering its fraud.  Plaintiffs are further entitled to recover pre-judgment interest, attorneys' fees and costs, expert witness fees, and such other sums as the jury may determine to be fair and just.

252.    Since Defendants' misconduct and acts complained of herein were performed, even if not intentionally, in conscious and intentional disregard of and indifference to the rights and safety of others, which Defendants knew or should have known was reasonably likely to result in injury, damage, or other harm, the Plaintiff is entitled to recover of Defendants punitive damages.

**COUNT IV**
Trespass to Chattels

253.    Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs as if fully realleged here.

254.    Plaintiffs bring this Count against VWAG and VWGOA.

255.    Volkswagen, by and through James Liang, created the Fraudulent Flash in a further attempt to conceal the Cheat Device, and one version of it is referred to as the 2306 ECM Software.

256.    On information and belief, VWAG and VWGOA issued a letter to the Plaintiffs herein entitled "Emissions Service Action 2306 – ECM Software" in which VWAG and VWGOA stated as follows:

As part of Volkswagen's ongoing commitment to our environment, and in cooperation with the United States Environmental Protection Agency and the California Air Resources Board, we are informing you of our decision to conduct an emissions service action on certain 2010-2014 model year Volkswagen vehicles equipped with a 2.0L TDI® Clean Diesel engine. Our records indicate that you are the owner of a vehicle affected by this action.

**What is the issue and what will we do?**  The vehicle's engine management software has been improved to assure your vehicle's tailpipe emissions are optimized and operating efficiently. Under certain operating conditions, the earlier strategy may have increased the chance of the vehicle's MIL illuminating. If the

MIL illuminates for any reason, your vehicle will not pass an IM inspection in some regions.

To address this issue, your authorized Volkswagen dealer will update the ECM software in your vehicle. This work will take about one hour to complete and will be performed for you free of charge.

257.   On information and belief, Plaintiffs complied with the request of VWAG and VWGOA in the foregoing letter and took the at-issue vehicle(s) to Volkswagen's authorized dealer in Pennsylvania for service.

258.   On information and belief, acting as the agent for VWAG and VWGOA and at the request of VWGOA, the authorized dealer(s) installed the 2306 ECM Software into Plaintiffs' Vehicle.

259.   Plaintiffs did not authorize VWAG or VWGOA or any of its dealers to install the 2306 ECM Software for the purpose of further concealing the fraudulent Cheat Device. Consequently, VWAG and VWGOA committed intentional trespass upon Plaintiffs' personal property when it went beyond the authorization given by Plaintiffs and installed the Fraudulent Flash in the Vehicle thereby constituting an unlawful interference or dispossession of Plaintiffs' property.

260.   At the time of the trespass, Plaintiffs were in actual or constructive possession of the Vehicle.

261.   As a direct and proximate result of the trespass by VWAG and VWGOA on Plaintiffs' chattels, the Plaintiffs have been damaged.  Without limiting the foregoing, Plaintiffs state that they were dispossessed of the their respective Vehicle and lost its use during the time of the service by Volkswagen's authorized dealer; the Vehicle was impaired as to condition, quality and value with the unauthorized installation of the 2306 ECM Software; and the Vehicle was permanently altered in a way that led the Plaintiffs to be further

deceived for a longer period of time by the enhanced concealment of the Cheat Device and the OBD Cheat. Because the trespass on Plaintiffs' chattel by VWAG and VWGOA was willful and wanton, and otherwise in reckless disregard of Plaintiffs' rights, punitive damages against VWAG and VWGOA should be awarded.

### COUNT V
Maryland Consumer Protection Act
Md. Code Com. Law §§ 13-101 *et seq.*

262. Plaintiffs incorporate by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs.

263. Plaintiffs bring this Count against all Defendants.

264. Plaintiffs and Defendants are "persons" within the meaning of Md. Code Com. Law § 13-101(h).

265. The Maryland Consumer Protection Act ("Maryland CPA") provides that a person may not engage in any unfair or deceptive trade practice in the sale of any consumer good.  Md. Code Com. Law § 13-303.

266. Defendants' actions as set forth above occurred in the conduct of trade or commerce.

267.  In the course of their business, Defendants intentionally or negligently concealed and suppressed material facts concerning the Fraudulent Vehicles. Defendants accomplished this by developing, supplying, and installing extremely sophisticated Cheat Device software in the Fraudulent Vehicles that caused the vehicles to pass emissions tests yet in real world conditions the Fraudulent Vehicles emitted significantly larger quantities of pollutants, sometimes 40 times greater than applicable standards. Plaintiffs had no way of knowing or discerning that Defendants' representations were false. Indeed, discovering the

falsity required the engineering expertise of the WVU Center for Alternative Fuels, Engines & Emissions.

268.    Defendants engaged in misleading, false, unfair or deceptive acts or practices that violated the Maryland CPA by installing, failing to disclose and/or actively concealing the Cheat Device and the true cleanliness and performance of the "clean" diesel engine system, by marketing Volkswagen vehicles as legal, reliable, environmentally clean, efficient, and of high quality, and by presenting Volkswagen as a reputable manufacturer that valued environmental cleanliness and efficiency, and that stood behind their vehicles after they were sold.

269.    Defendants also violated the Maryland CPA by concealing the Cheat Device and the true emissions, efficiency and performance of the Fraudulent Vehicles, resulting in a raft of negative publicity once Defendants' fraud was exposed. Defendants' supply and use of the illegal defeat device and concealment of the true characteristics of the "clean" diesel engine system were material to Plaintiffs. A vehicle made by a reputable manufacturer of environmentally friendly vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of environmentally dirty vehicles that conceals its polluting engines rather than promptly remedying them.

270.    The Defendants further engaged in acts violating the Maryland CPA when Defendants disseminated or otherwise caused to be disseminated before the general public of the State of Maryland, misleading advertisements by which they sought to sell or lease the Fraudulent Vehicles.

271.    The specifics of these advertisements, and their deceptive nature, was previously set forth herein. Without limiting the foregoing, the Plaintiff states that Defendants advertised the

Fraudulent Vehicles in Maryland as "clean" "green" "environmentally friendly" and as having "low emissions" and further made those false statements in the Official Vehicle Brochure specifically and previously quoted herein.

272.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive regulators and reasonable consumers, including Plaintiffs, about the true environmental cleanliness and efficiency of Volkswagen-branded vehicles, the quality of the Volkswagen brand, the devaluing of environmental cleanliness and integrity at Volkswagen, and the true value of the Fraudulent Vehicles, including the Plaintiffs' Vehicle.

273.    VWGOA, VWAG and Audi AG knew that their Maryland advertisements were misleading because key employees within those organizations (e.g. Schmidt, Liang, Juergen Peter, Heinz-Jakob Neusser, Rudolf Krebs, Jens Hadler, Friedrich Eichler, Bernd Gottweis, Zaccheo Giovanni Pamio) not only knew about the Diesel Fraud, the Cheat Device, the OBD Cheat, and the Fraudulent Flash, but they were directly involved in the intentional development and implementation of this diabolical plan.

274.    Even if the top executives at VWGOA, VWAG, and Audi AG were not aware of the fraud from the beginning, Volkswagen and Audi certainly could have discovered it had they exercised reasonable care for the reasons previously set forth in detail herein.

275.    In short, even if Volkswagen's and Audi's false advertisements and other violations of the Maryland CPA were not intentionally deceptive, at best the Defendants were grossly negligent in allowing such false statements and material omissions to be made, and to permit the Fraudulent Vehicles to be sold.  It is also clear that the Defendants disseminated the misleading advertisements described herein with the intent and purpose, directly or indirectly, of selling the Fraudulent Vehicles, including the Vehicle sold to Plaintiffs.

276.    Plaintiffs suffered ascertainable loss and actual damages as a direct and proximate result of Defendants' misrepresentations and its concealment of and failure to disclose material information, which occurred, in large part, in Maryland. Plaintiffs would not have purchased the Vehicle if the Vehicle's true nature had been disclosed.

277.    Defendants had an ongoing duty to all Volkswagen customers to refrain from unfair and deceptive practices under the Maryland CPA in the course of its business of marketing and selling cars in Maryland.

278.    Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

279.    Pursuant to Md. Code Com. Law § 13-408, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Maryland CPA.

**COUNT VI**
Federal Civil RICO
18 U.S.C. § 1964

280.    Plaintiff incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs.

281.    Plaintiffs bring this Count against all Defendants.

282.    Acts of criminal activity were committed from 2008 through 2015 in furtherance of the Deceptive Emissions Scheme as follows:

    i.    On September 9, 2016, in accordance with a plea agreement signed on August 31, 2016, James Liang ("Liang") pled guilty to conspiracy to defraud the United States in violation of 18 U.S.C. 371, which includes an admitted violation of 18 U.S.C. § 1343 for wire fraud – such wire fraud

constitutes criminal activity because it is subject to indictment or information as a criminal offense and it is one of the offenses set forth in 18 U.S.C. § 1961(B);

ii.  On March 10, 2017, in accordance with a plea agreement signed on January 11, 2017, VWAG pled guilty to conspiracy to defraud the United States in violation of 18 U.S.C. 371, which includes admitted violations of 18 U.S.C. § 1343 for wire fraud; and further pled guilty to obstruction of justice in violation of 18 U.S.C. § 1512 – such wire fraud and obstruction of justice, constitutes criminal activity under the provisions of Fla. Stat. § 772.102(b) because it is subject to indictment or information as a criminal offense and it is one of the offenses set forth in 18 U.S.C. § 1961(B);

iii.  On August 4, 2017, in accordance with a plea agreement signed on July 24, 2017, Oliver Schmidt pled guilty to conspiracy to defraud the United States in violation of 18 U.S.C. 371, which includes an admitted violation of 18 U.S.C. § 1343 for wire fraud – such wire fraud constitutes criminal activity because it is subject to indictment or information as a criminal offense and it is one of the offenses set forth in 18 U.S.C. § 1961(B);

iv.  On January 11, 2017, other VWAG employees were indicted for their roles in the nearly 10-year Diesel Fraud conspiracy including Heinz-Jakob Neusser, Bernd Gottweis, and Jürgen Peter, which charges include violations of 18 U.S.C. § 1343 for wire fraud – such wire fraud constitutes

criminal activity because it is subject to indictment or information as a criminal offense and it is set forth in 18 U.S.C. § 1961(B);

v. VWGOA and VWAG engaged in wire fraud in violation 18 U.S.C. § 1343, with respect to their involvement in the LRRI Study, insofar as they used the wires (e.g. telephone, e-mail transmissions, facsimile) across state lines in furtherance of that fraudulent research. Johnson and Liang repeatedly communicated with LRRI researchers via e-mail and telephone (Johnson from Michigan to New Mexico; Liang from California to New Mexico), as did VWAG executive Michael Spallek (who VWAG also utilized at EUGT to initiate the LRRI Study – wire communications from Germany to New Mexico, Michigan and Virginia), all in furtherance of the fraudulent study. Such misconduct criminal activity.

vi. Audi engaged in wire fraud in violation 18 U.S.C. § 1343, by and through Audi executive Zaccheo Giovanni Pamio, head of thermodynamics in Audi's engine development department, who was arrested and charged with, *inter alia*, conspiracy to commit wire fraud on or about July 7, 2017, which charges are pending in the United States District Court for the Eastern District of Michigan, Case No. 2:17-mj-30330. Such misconduct constitutes criminal activity.

283. A pattern of criminal activity occurred in furtherance of the Diesel Fraud because more than two incidents of the above-enumerated criminal offenses were perpetrated by numerous individuals employed by Defendants (hundreds of acts of criminality were committed) within the least ten years impacting nearly 600,000 consumers here in the U.S.

alone. While the term Cheat Device is used herein in the singular, in reality there were multiple defeat-device strategies used by this criminal association across multiple lines of vehicles, across the differing engine types within the same make and model vehicle, and across multiple brands including Volkswagen, Porsche and Audi. The intent of each of the criminal actors was the same – to maximize sales and resulting profits of diesel vehicles, irrespective of the harm or criminality of the conduct required to effectuate that result. The victims are, in general, similarly situated to Plaintiffs – unsuspecting environmentally conscious consumers from whom the Diesel Fraud was concealed by and through the criminal enterprise.

284. An association-in-fact enterprise existed at all relevant times herein between VWAG, VWGOA, Audi, AG, Dr. Ing. H.C.F. Porsche AG, Porsche Cars North America, Inc., Heinz-Jakob Neusser, Bernd Gottweis, Jürgen Peter, James Liang, Zaccheo Giovanni Pamio, and Oliver Schmidt, (the "Diesel Fraud Syndicate"), which maintained the common goal of furthering the Diesel Fraud to maximize pecuniary gain of the enterprise.

285. VWAG, VWGOA, and Audi AG are each a "person" as that term is used in 18 U.S.C. § 1964 et seq.

286. The Diesel Fraud Syndicate and VWAG and Audi AG and VWGOA are functionally distinct because VWAG and Audi AG and VWGOA performed differing functional roles within the Diesel Fraud Syndicate. Specifically, VWAG's role was to serve primarily as the manufacturer of the Volkswagen-branded Fraudulent Vehicles, Audi AG's role was to serve primarily as the manufacturer of the Audi-branded Fraudulent Vehicles, while VWGOA's role was to serve primarily as the importer/promoter of the Fraudulent Vehicles in the United States.

287.    The Diesel Fraud Syndicate and VWAG and Audi AG and VWGOA are also functionally distinct because Volkswagen attempted to use the separate legal incorporation of VWAG and Audi AG and VWGOA, and that parent-subsidiary relationship, to facilitate racketeering activity.   Specifically, VWAG and Audi AG allegedly sought to keep evidence of the Diesel Fraud from VWGOA (other than James Liang and Oliver Schmidt) to thereby allow VWGOA to claim it did not maintain the requisite intent to defraud or to commit any criminal act when importing, marketing and selling the Fraudulent Vehicles. Because VWGOA was a direct participant in the Diesel Fraud Syndicate and was largely responsible for pursuing its pecuniary interests through a pattern of criminal activity over the last ten years it would be improper to allow it to avoid liability by invoking what would be tantamount to an intra-corporate conspiracy defense, which Plaintiffs submit is not applicable under the facts of this case.

288.    VWAG, Audi AG, and VWGOA violated 18 U.S.C. § 1964 et seq. because they each associated with the Diesel Fraud Syndicate to conduct and to participate, both directly and indirectly, in furtherance of the sale of the Fraudulent Vehicles, and in doing so, engaged in a pattern of criminal activity as described previously herein.  In so doing, VWAG, Audi AG and VWGOA acted both independently, and in concert, to control the actions and management of the Diesel Fraud Syndicate.

289.    VWAG (by and through Heinz-Jakob Neusser, Bernd Gottweis, Jürgen Peter, and otherwise) and VWGOA (by and through James Liang and Oliver Schmidt and otherwise) and Audi AG (by and through Zaccheo Giovanni Pamio and otherwise) conspired to violate 18 U.S.C. § 1964 et seq., and therefore, are also jointly and severally liable for Plaintiff's damages resulting from such violations.

290.   As a direct and proximate result of Volkswagen's and Audi's violations Federal Civil RICO as described herein, and of its commissions of the various crimes heretofore detailed (e.g. false marketing and wire fraud) Plaintiff suffered injury by purchasing one of the Fraudulent Vehicles, which the Plaintiff would not have purchased in the absence of the Defendants' fraud and other criminal acts. Plaintiff is entitled to recover damages for the losses relating from the Defendants' violations, as well as attorneys' fees and costs (at trial and in the appellate courts), as well as treble damages, which is hereby requested.

**COUNT VII**
Violation of 15 U.S.C. §§ 2301, et seq.
The Magnuson-Moss Warranty Act ("MMWA")

291.   Plaintiff incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs.

292.   Plaintiffs bring this Count against VWAG and VWGOA.

293.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

294.   VWAG and VWGOA are "supplier[s]" and "warrantor[s]" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

295.   The Vehicle is a "consumer products" within the meaning of the Magnuson Moss Warranty Act, 15 U.S.C. § 2301(1).

296.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

297.   VWAG and VWGOA provided Plaintiffs with the following two express warranties, which are covered under 15 U.S.C. § 2301(6):

a. Manufacturer's Warranty—This written warranty provides "bumper-to-bumper" limited express warranty coverage for a minimum of 3 years or

36,000 miles, whichever comes first. The warranty covers emissions related repairs.

b. Federal Emissions Warranty—Consistent with federal law, the Volkswagen Defendants provided a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover the repair and replacement of: all emission control and emission-related parts for two years or 24,000 miles (whichever comes first); and specified major emission control components, including catalytic converters, electronic emissions control unit or computer and on–board emissions diagnostic device or computer for 8 years or 80,000 miles (whichever comes first).

298.    The Vehicle's implied warranties are covered under 15 U.S.C. § 2301(7).

299.    VWAG and VWGOA breached these warranties as described in more detail above. Without limitation, the Vehicle has a design defect in that it emits more pollutants than is allowable under the applicable regulations.

300.    VWAG and VWGOA admitted that the Fraudulent Vehicles, which class of vehicles includes the Plaintiffs' Vehicle, are illegal, defective and of lesser quality than advertised.

301.    Plaintiffs have had sufficient direct dealings with the Defendants or their agents (dealerships) to establish privity of contract between the Defendants, on the one hand, and Plaintiffs on the other hand. Nonetheless, privity is not required here because Plaintiffs are intended third-party beneficiaries of contracts between the Defendants or their dealers, and of their implied warranties.

302.    The dealers were not intended to be the ultimate users of the Vehicle and have no rights under the warranty agreements provided with the Vehicle; the warranty agreements were designed for and intended to benefit consumers only.

303.    Affording VWAG and VWGOA a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile.

304. At the time of sale of the Vehicle, the VWAG and VWGOA knew of the misrepresentations concerning the Vehicle's inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.

305. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the VWAG and VWGOA a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

306. Plaintiffs would suffer economic hardship if they returned their Vehicle but did not receive the return of all payments made by them to Volkswagen (and its authorized dealership).

307. Because VWAG and VWGOA are refusing to acknowledge any revocation of acceptance and have not immediately returned any payments made, Plaintiffs have not re-accepted their Vehicle by retaining it.

308. The amount in controversy of Plaintiffs' individual claim exceeds the sum of $75,000, exclusive of interest and costs, computed on all claims to be determined in this lawsuit.

309. Plaintiffs seek all damages permitted by law, including diminution in the value of their Vehicle, in an amount to be proven at trial.

## COUNT VIII
### Unjust Enrichment

310. Plaintiff incorporates by reference, as if fully set forth herein, each allegation set forth in the preceding paragraphs.

311. Plaintiff conferred a benefit upon the Defendants by purchasing one of their Fraudulent Vehicles.

312.     The Defendants understood the benefits that the Plaintiff's purchase of the at-issue Vehicle, and the purchases of similarly situated consumers, would bring to the Defendants, and Defendants accepted that benefit.

313.     The Defendants acceptance and retention of the benefits of all the money that it received from the sale of the Fraudulent Vehicles, including all the money obtained from Plaintiff for such purchase, would be inequitable and would unjustly enrich Defendants.

314.     Plaintiff is, therefore, entitled to a complete disgorgement from the Defendants of either the full purchase price of the at-issue vehicle, or of the gross profit (without deduction for expenses incurred in pursuing the Defendants' fraudulent scheme) that the Defendants' realized from the Plaintiff's purchase (or all lease payments in the event of a lease), as well as any other unjust enrichment that the Defendants' received from their scheme.

### COUNT IX
Breach of Implied Warranty of Merchantability
(Md. Code Com. Law § 2-314)

315.     Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

316.     Plaintiffs bring this Count against VWAG and VWGOA.

317.     VWAG and VWGOA are and were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

318.     The Plaintiffs' Vehicle is and was at all relevant times a "good" within the meaning of Md. Code Com. Law §§ 2-105(1).

319.     A warranty that the Vehicle was in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Md. Code Com. Law § 2-314.

320.   The Vehicle when sold was not in merchantable condition and was not fit for the ordinary purpose for which vehicles are used.

321.   Specifically, the Vehicle is inherently defective in that it does not comply with federal and state emissions standards, rendering certain emissions functions inoperative; and the "clean" diesel engine system was not adequately designed, manufactured, and tested.

322.   Volkswagen was provided notice of these issues by the investigations of the EPA and individual state regulators, numerous complaints filed against it and by numerous individual letters and communications sent by consumers within a reasonable amount of time after the allegations of defects became public.

323.    As a direct and proximate result of the breach of the implied warranty of merchantability by VWGOA and VWAG, Plaintiffs were damaged in an amount to be proven at trial.

**COUNT X**
Breach of Express Warranty
(Md. Code Com. Law § 2-313)

324.   Plaintiffs reallege and incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

325.   Plaintiffs bring this Count against VWAG and VWGOA.

326.   VWAG and VWGOA are and were at all relevant times "merchants" with respect to motor vehicles under Md. Code Com. Law § 2-104(1) and "sellers" of motor vehicles under § 2-103(1)(d).

327.   The Plaintiffs' Vehicle is and was at all relevant times a "good" within the meaning of Md. Code Com. Law §§ 2-105(1).

328.   In connection with the purchase of the Vehicle, VWAG and VWGOA provided an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles,

whichever occurs first.  This NVLW exists to cover "any repair to correct a manufacturers defect in materials or workmanship."

329.   The Clean Air Act requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty."

330.   The EPA requires vehicle manufacturers to provide a Performance Warranty with respect to the vehicles' emission systems.  Thus, Volkswagen also provides an express warranty for its vehicles through a Federal Emissions Performance Warranty.  The Performance Warranty required by the EPA applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test.  Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first.  These major emission control components subject to the longer warranty include the catalytic converters, the electronic emission control unit, and the onboard emission diagnostic device or computer.

331.   The EPA requires vehicle manufacturers to issue Design and Defect Warranties with respect to their vehicles' emission systems.  Thus, the VW Entity Defendants also provide an express warranty for their vehicles through a Federal Emission Control System Defect Warranty. The Design and Defect Warranty required by the EPA covers repair of emission control or emission related parts which fail to function or function improperly because of a defect in materials or workmanship.  This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

332.   As manufacturers of light-duty vehicles, VWGOA and VWAG were required to provide these warranties to purchasers of their "clean" diesel vehicles.

333.   VWGOA's and VWAG's warranties formed a basis of the bargain that was reached when Plaintiffs purchased their Vehicle equipped with the non-compliant "clean" diesel engine and emission systems.

334.   Plaintiffs experienced defects within the warranty period.  Despite the existence of warranties, VWGOA and VWAG failed to inform Plaintiffs that the Vehicle was intentionally designed and manufactured to be out of compliance with applicable state and federal emission laws and failed to fix the defective emission components free of charge.

335.   VWGOA and VWAG breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any parts they supplied.  VWGOA and VWAG have not repaired or adjusted and have been unable to repair or adjust to the condition promised at the time of sale, the Vehicle's workmanship defects.

336.   Affording VWGOA and VWAG a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile here because VWGOA and VWAG have admitted that the approved emissions' modification that they sought and have offered cannot correct the Vehicle to the emissions' levels the Vehicle was purportedly certified to at the time of the sale.

337.   VWGOA and VWAG were provided notice of these issues by numerous complaints filed against them, within a reasonable amount of time after Volkswagen publicly admitted to using a defeat device in the Fraudulent Vehicles to evade clean air standards.

338.   As a direct and proximate result of the VW Entity Defendants' breach of express warranties, Plaintiffs have been damaged in an amount to be determined at trial.

## PUNITIVE DAMAGES STATEMENT

339.  No portion of any amount of punitive damages or exemplary damages sought herein against any Defendant is required to be shared, in whole or in part, with any governmental entity under applicable law.

## JURY DEMAND

340.  Plaintiff demands trial by jury on all claims set forth herein so triable.

WHEREFORE, premises considered, Plaintiff prays for judgment against the Defendants, jointly and severally, damages and other relief in amounts to be determined at trial as follows:

A.  Actual damages, including economic and non-economic damages (including, without limitation, damages for embarrassment, mental anguish, emotional distress and inconvenience);

B.  Statutory damages;

C.  Punitive and exemplary damages;

D.  Prejudgment interest;

E.  An award of costs and attorneys' fees;

F.  Such other further and additional relief as may be appropriate.

Dated: March 25, 2019

Respectfully submitted,

DOMENIC BUFALINI and
LORI LEE BUFALINI

By:    /s/ *Michael J. Melkersen*
_____
Michael J. Melkersen

Michael Melkersen
The Law Offices of Michael J. Melkersen, P.C.
9633 S. Congress Street
New Market, Virginia 22844
Telephone: 540.740.3937
Facsimile: 540.740.8851
E-mail: mike@mlawpc.com

*Attorneys for the Plaintiffs*

**EXHIBIT A**

https://www.youtube.com/watch?v=HhF7mVnbiXo (Jetta Meets Prius – Published July 2009)

https://www.youtube.com/watch?v=rnhsNO4FThY (Audi – Diesel No Longer Dirty Word – Published June 2009)

https://www.youtube.com/watch?v=fH834IFpGTQ (VW Touareg TDI – Coffee Filter Test - Published 2009)

https://www.youtube.com/watch?v=461D-iVGFaU (Audi Q7 – Claims NOx Reduced 90% - Published June 2009)

https://www.youtube.com/watch?v=vjzwqeDUBbw (VW TDI – "Bigger than You" – Published 2009)

https://www.youtube.com/watch?v=c71gjt-jXiI (Audi TDI Clean Diesel – "The Range" – Published 2009)

https://www.youtube.com/watch?v=Q5ix69U7B3c (Audi TDI Clean Diesel – "The Future" – Published 2009)

https://www.youtube.com/watch?v=Ml54UuAoLSo (Audi Green Police – Published February 2010)

https://www.youtube.com/watch?v=aYoq4glQV8s (Audi A3 TDI – "Do Your Part" – Published May 2010)

https://www.youtube.com/watch?v=0juKwJs_zko (Audi A5 TDI – Suicide Ad – Published January 2010)

https://www.youtube.com/watch?v=OGGaRs4B3aQ (Golf TDI – Published February 2011)

https://www.youtube.com/watch?v=gYu_6K0W-ug (Jetta 2012 – "Is it Safe" – Published February 2012)

https://www.ispot.tv/ad/7k4x/volkswagen-passat-tdi-spanish-road-trip (Passat Clean Diesel - Spanish Road Trip – Published 2012)

https://www.ispot.tv/ad/7d_s/volkswagen-presidents-day-event-ugly-laugh (Jetta TDI Clean Diesel – Ugly Laugh – Published 2013)

https://www.ispot.tv/ad/7b_r/volkswagen-the-tdi-clean-diesel-family (TDI Clean Diesel - Fast – Published 2013)

https://www.ispot.tv/ad/7ZFr/volkswagen-passat-tdi-toys (Passat Clean Diesel - Kids Toys – Published 2013)

https://www.ispot.tv/ad/7bXf/audi-tdi-crestco-gas-station (Audi TDI Clean Diesel – Screaming at Lady Not to Pump Diesel – Published 2013)

https://www.ispot.tv/ad/72d4/audi-tdi-featuring-claire-danes (Audi TDI - Claire Danes – Published 2013)

https://www.ispot.tv/ad/7wJV/2013-volkswagen-jetta-the-longcut (Jetta TDI Clean Diesel – the Long Cut – Published 2013)

https://www.ispot.tv/ad/7grs/volkswagen-passat-tdi-clean-diesel-event-two-deals-in-one# (Passat TDI Clean Diesel Sales Event – Published Early 2014)

https://www.ispot.tv/ad/7zDl/volkswagen-jetta-tdi-clean-diesel-no-compromise# (Jetta TDI Clean Diesel – Published 2014)

https://www.ispot.tv/ad/7sHJ/volkswagen-jetta-tdi-clean-diesel-non-stop (Jetta Clean Diesel - Airline Theme –  Published November 2014)

https://www.ispot.tv/ad/7guX/volkswagen-jetta-tdi-clean-diesel-event-no-better-time-to-buy (Clean Diesel Sales Event – Published 2014)

https://www.ispot.tv/ad/7g5p/2014-volkswagen-passat-tdi-clean-diesel-event (Clean Diesel Sales Event – Published 2014)

https://www.ispot.tv/ad/7EXk/volkswagen-golf-family-podium-race-song-by-the-strokes (Golf TDI - Motor Trend Car of Year – Published 2014)

https://www.ispot.tv/ad/7jj4/2014-volkswagen-golf-tdi-road-trip (Gold TDI - Road Trip – Published 2014)

https://www.ispot.tv/ad/7Wdx/volkswagen-sign-then-drive-event-black-friday-bonus (VW Sign and Drive Event for Black Friday – Published 2014)

https://www.youtube.com/watch?v=HUS0rQkRxMQ (Audi – Mechanic Zombies – Published 2015)

https://www.youtube.com/watch?v=WNS2nvkjARk  (Old Wives Talk Dirty – Published April 2015)

https://www.youtube.com/watch?v=XiWmGxpRZJg (Passat Clean Diesel – Kids Destroying Convenience Store – Published May 2015)

https://www.ispot.tv/ad/7Q2N/2015-volkswagen-passat-tdi-clean-diesel-diesel-cars (Passat Clean Diesel - VW Claims More Diesel Cars than All Other Brands Combined - Published 2015)

https://www.ispot.tv/ad/7Jmk/2015-volkswagen-passat-tdi-clean-diesel-question-song-by-magic# (Passat Clean Diesel – Published 2015)

https://www.ispot.tv/ad/7JI5/volkswagen-presidents-day-event-get-the-presidential-treatment (Clean Diesel President's Day Sale – Published 2015)


https://www.ispot.tv/ad/7ecn/volkswagen-passat-tdi-diesel-old-wives-tale-2-loud (Old Wives Tales - Diesel is Loud – Published 2015)

https://www.ispot.tv/ad/7aSw/2015-volkswagen-jetta-tdi-found-dog-duke-song-by-queen (Jetta TDI - Lost Dog - Published 2015)

https://www.ispot.tv/ad/7H0b/2015-volkswagen-jetta-both-fun-to-drive (Jetta TDI - Twin Commercial – Published 2015)

https://www.ispot.tv/ad/AkcM/2015-volkswagen-golf-bigger-podium (Golf TDI - Motor Trend Car of Year – Published 2015)